[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-11179

_____

D. C. Docket No. 99-00286 CV-J-16-TJC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2002
THOMAS K. KAHN
CLERK

SIERRA CLUB,
JUDY ROSIER, et al.,

Plaintiffs-Appellants,

versus

U.S. ARMY CORPS OF ENGINEERS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 25, 2002)**

Before ANDERSON and BLACK, Circuit Judges, and MORENO*, District Judge.

ANDERSON, Circuit Judge:

_____
*Honorable Federico A. Moreno, U S. District Judge for the Southern District of Florida, sitting by designation.

The Sierra Club and several individually named plaintiffs ("Sierra Club") brought suit against the United States Army Corps of Engineers ("Corps") and the Florida Department of Transportation ("FDOT") seeking to halt construction of the Suncoast Parkway, a 41.6 mile, four-lane tollroad that runs north-south from Hillsborough County, Florida through Pasco and Hernandez Counties. Sierra Club argues that the Corps failed to comply with the procedural requirements of Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536. Granting summary judgment in favor of the Corps and FDOT on the issues now before us, the district court entered final judgment. Sierra Club appeals. We affirm.

## I. FACTS

### A. Legal Background

#### 1. The Endangered Species Act

The Endangered Species Act, 16 U.S.C. §§ 1531-1544, charges federal agencies to carry out the Congressional policy of conserving endangered or threatened plant and animal species. To that end, Section 7 of the ESA requires every federal agency to insure that its actions are not likely to jeopardize the continued existence of any species which has been listed as endangered or threatened. 16 U.S.C. § 1536(a)(2).[1]

---

[1]16 U.S.C. § 1536(a)(2) reads:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency

Every agency is required to verify that its actions will not jeopardize any land-based listed species by consulting with, and obtaining the assistance of, the Secretary of Interior, acting through the Fish and Wildlife Service ("FWS").[2] Id. Using "the best scientific and commercial data available," an agency must determine if any listed species may be present in the area affected by a proposed project, and must confer with the Secretary whenever an action is likely to affect such a species. 16 U.S.C. § 1536(a).

Implementing regulations establish that an agency "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States." 50 C.F.R. § 402.02. This definition specifically includes the granting of permits. Id. The ESA provides that consultation with the Secretary may occur in cooperation with a prospective permit applicant if it is believed that a listed species may be affected by the proposed project.[3] 16 U.S.C.

---

(hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action . . . .  In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

[2]Consultation for marine species is made with the Secretary of Commerce, through the National Marine Fisheries Service.

[3]16 U.S.C. § 1536(a)(3) reads:

§ 1536(a)(3). That consultation, and any opinions which are issued as a result, is treated as a consultation between the agency and FWS, as required by 16 U.S.C. § 1536(a)(2), provided that no significant changes to the action have been made between the time of the consultation and the actual permitting of the action. 16 U.S.C. § 1536(b)(3)(B).[4]

As part of the consultation requirement, the agency is required to ask FWS in writing, whether, in its opinion, a listed or proposed species may be present in the action area.[5] 16 U.S.C. § 1536(c)(1).[6] If FWS responds that no protected species are

---

Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered or threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

[4]16 U.S.C. § 1536(b)(3)(B) reads:

Consultation under subsection (a)(3) of this section, and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2) of this section, and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

[5]The action area is not limited only to the immediate area involved in the project, but includes "all areas to be affected directly or indirectly" by the agency action. 50 C.F.R. § 402.02.

[6]16 U.S.C. § 1536(c)(1) reads:

To facilitate compliance with the requirements of subsection (a)(2) of this section,

4

present, the consultation requirement ends. If, however, FWS responds that there may

be an endangered or threatened species in the action area, the agency is required to

prepare a biological assessment ("BA"), which identifies any listed species within the

area and evaluates the potential effects of the action on those species. 16 U.S.C. §

1536(c)(1); 50 C.F.R. § 402.02. The BA requirement can be fulfilled as part of the

agency's procedural requirements established by the National Environmental Policy

Act of 1969 ("NEPA"), 42 U.S.C. § 4332, which are described below. 16 U.S.C. §

1536(c)(1).

According to the implementing regulations, a BA is also required for all federal

actions which constitute a "major construction activity," whether or not a listed

species is suspected in the area. 50 C.F.R. § 402.12(b)(1). A "major construction

activity" is defined as "a construction project (or other undertaking having similar

physical impacts) which is a major Federal action significantly affecting the quality

---

each Federal agency shall, with respect to any agency action . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated . . . and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. § 4332).

of the human environment as referred to in [NEPA, 42 U.S.C. § 4332(2)(C)]." 50 C.F.R. § 402.02. The term "major" reinforces the term "significantly," but has no meaning independent of it. Andrus v. Sierra Club, 442 U.S. 347, 364 n.23, 99 S.Ct. 2335, 2344 n.23 (1979); 40 C.F.R. § 1508.18. The regulations promulgated to institute NEPA also specifically provide that "major" actions include approving permits for construction. 40 C.F.R. § 1508.18(b)(4).

If the BA reveals no potential jeopardy to a listed species, and FWS either agrees or proposes alternatives which would eliminate any jeopardy it perceives, the project may proceed. 50 C.F.R. § 402.12(k)(1). As part of the "no jeopardy" finding, the FWS may issue an incidental take permit, which authorizes incidental taking of the species and specifies the taking's impact, any "reasonable and prudent" minimizing measures that must be implemented, and the terms and conditions imposed upon the agency or permit applicant. 16 U.S.C. § 1536(b)(4).[7]

---

[7]16 U.S.C. § 1536(b)(4) reads:

If after consultation under subsection (a)(2) of this section, the Secretary concludes that--

> (A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;
> (B) the taking of an endangered species or threatened species incidental to the agency action will not violate such subsection; and
>  . . . .

If, on the other hand, the BA does reveal a potential impact on a listed species, the agency must initiate "formal consultation" with FWS. 50 C.F.R. § 402.14. Formal consultation requires FWS to review the available data and evidence, evaluate the status of the species and the potential effects of the agency action, and formulate a biological opinion, which states whether the action and its cumulative effects is likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A);[8] 50 C.F.R. § 402.14(g)-(h). If potential jeopardy to a species exists, the FWS may suggest "reasonable and prudent alternatives" which

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--

(i) specifies the impact of such incidental taking on the species,
(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
 . . . .
(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

[8]16 U.S.C. § 1536(b)(3)(A) reads:

Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a) of this section, the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency or applicant in implementing the agency action.

7

the agency might take to avoid harming the species. 16 U.S.C. § 1536(b)(3)(A).

An incidental take permit may be issued if the alternatives offered will sufficiently

minimize the impact to remove the potential jeopardy to the species. 16 U.S.C. §

1536(b)(4)(a); 50 C.F.R. § 402.14(i)(1).

### 2. The National Environmental Policy Act

Agencies are also required by statute to consider the environmental

consequences of their actions more generally. The National Environmental Policy

Act of 1969, 42 U.S.C. §§ 4321-4370d, is not a substantive environmental statute

which dictates a particular outcome if certain consequences exist. Instead, NEPA

creates "a particular bureaucratic decisionmaking process." Sierra Club v. Marsh,

872 F.2d 497, 497 (1st Cir. 1989). Section 102(2), 42 U.S.C. § 4332(2)(C),[9]

---

[9]42 U.S.C. § 4332(2)(C) reads:

[A]ll agencies of the Federal government shall--

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall

8

contains a Congressional mandate that federal agencies consider the environmental impact, and potential alternatives, for every proposed "major Federal action significantly affecting the quality of the human environment."  It is an "action-forcing" provision designed to prevent agencies from acting on incomplete information and to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845 (1989).

The first requirement NEPA imposes on an agency is to determine whether an action is a "major" action with a "significant effect."[10]  This determination requires preparation of an environmental assessment ("EA").  Hill v. Boy, 144 F.3d 1446, 1450 (11th Cir. 1998); 40 C.F.R. § 1501.3.  The EA should provide enough evidence and analysis to guide the agency to one of two conclusions:  (1) a finding

consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.  Copies of such statements and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . .

[10]The general meaning of this phrase is the same as it is under the ESA.  The term "major" has no meaning independent of "significant," and issuing permits can constitute a major action.

that the project will have a significant effect, or (2) a finding of no significant impact ("FONSI"). If the latter conclusion is reached, the agency issues a FONSI, which incorporates the EA and explains why the action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13.

If the conclusion in the EA is that the action will have a significant effect, then the project is "major," and the agency must prepare an environmental impact statement ("EIS"), as described in 42 U.S.C. § 4332(2)(C). The EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. It is to "be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." Id. The discussion should include any potential impact on endangered or threatened species.

Part of the EIS process is determining the appropriate scope of the analysis required. This is accomplished by considering exactly what type of action is involved, its direct and indirect impacts, and potential alternatives. The scope may also depend upon the relationship of the EIS to other environmental impact statements. If an action is a component of a larger project, an agency may "tier" its EIS's in order to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for discussion." 40 C.F.R. § 1502.20. This is accomplished by incorporating earlier statements into the new analyses, and

10

focusing only what has not previously been considered. Tiering is also appropriate where a broad EIS has already been prepared and the agency is now considering specific aspects of a proposal.

Agencies are not required to duplicate the work done by another federal agency which also has jurisdiction over a project. NEPA regulations encourage agencies to coordinate on such efforts. As early as possible, a lead agency should be designated. Other involved agencies are designated "cooperating agencies." 40 C.F.R. § 1501.6. A lead agency, who ultimately signs the EIS, is responsible for ensuring the involvement of all other agencies involved and supervising the EIS preparation. 40 C.F.R. §§ 1501.5(a), 1501.6(a). The lead agency shall use the environmental analyses of the cooperating agencies "to the maximum extent possible." 40 C.F.R. § 1501.6(a)(2). Cooperating agencies are permitted to adopt an EIS signed by the lead agency, provided they undertake "an independent review of the statement" and determine that their "comments and suggestions have been satisfied." 40 C.F.R. § 1506.3(c).

If, after the original EIS is prepared, the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency is required to

11

prepare a supplemental environmental impact statement (SEIS). 40 C.F.R. §

1502.9(c)(1). The standard for determining when an SEIS is required is

"essentially the same" as the standard for determining when an EIS is required.

Envtl. Def. Fund v. Marsh, 651 F.2d 983, 991 (5th Cir. Unit A July 1981).[11] If

"'the post-[original EIS] changes in the [project] will have a 'significant' impact on

the environment that has not previously been covered by the [original] EIS,'" a

supplement is necessary. Nat'l Wildlife Fed'n v. Marsh, 721 F.2d 767, 782 (11th

Cir. 1983) (quoting Envtl. Def. Fund, 651 F.2d at 991).

### 3. Standard of Review

The procedural requirements of the ESA correspond, and overlap with, the

procedural requirements of NEPA. Challenges brought under either statute are

reviewed by the arbitrary and capricious standard, as defined by the Administrative

Procedure Act, 5 U.S.C. §§ 701-706. Under this standard, the appellate court gives

deference to the agency decision by reviewing for clear error, and by refraining

from substituting its own judgment for that of the agency. Motor Vehicle Mfrs.

Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103

S.Ct. 2856, 2866-67 (1983). However, the court must also look beyond the scope

---

[11]In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

of the decision itself to the relevant factors that the agency considered. Id. at 43, 103 S.Ct. at 2866-67. Its duty is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541 (11th Cir. 1990). This duty requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record. Mo. Coalition for the Env't v. Corps of Eng'rs of the U.S. Army, 866 F.2d 1025, 1031 (8th Cir. 1989).

An agency has met its "hard look" requirement if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43, 103 S.Ct. at 2866. The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise. Id., 103 S.Ct. at 2867.

If the court finds deficiencies in the agency's reasoning, it may not rectify

them or provide a reasoned basis for the agency decision which the agency itself has not articulated.  Id., 103 S.Ct. at 2867.  Instead, it must remand to the agency so that it may reconsider its own reasoning and decision.

B. Factual Background

Planning for the Suncoast Parkway began in 1988.  It involved a cooperative effort between FDOT, the Federal Highway Administration (FHWA), and the Corps.  A draft environmental impact statement was proposed in 1992, and public hearings were held.  Sierra Club did not participate in the hearings.

Sixteen potential alignments for the Parkway were discussed in the draft EIS.  Because of the potential existence of the eastern indigo snake in the action area, FDOT initiated formal consultation with FWS, pursuant to Section 7 of the ESA.  After FWS expressed concerns over the methodology used to evaluate the potential impact on two listed species, the Florida scrub jay and the red-cockaded woodpecker, additional surveys and a revised biological assessment were also prepared.

The formal consultation resulted in a biological opinion, issued in 1993 by the FWS ("1993 biological opinion"), which concluded that the continued existence of the eastern indigo snake was not likely to be jeopardized by the

14

Parkway. The biological opinion included an incidental take permit for the eastern indigo snake, and specific instructions for what steps the contractors must take if a snake were encountered. The conclusion of FWS was based in part of FDOT's agreement to purchase and preserve 2700 acres of upland and wetland suitable for preserving the snake.

In August, 1994, a final EIS ("1994 EIS") was issued by the FHWA, FDOT, and the Corps, which included the final selection of the site for the Parkway. As the road was to be fully funded by the State of Florida, the FHWA terminated its participation.

As a means of facilitating the final planning of the Parkway and "preserving the balance between Florida's environmental protection objectives and the state's transportation needs," an informal partnering process was organized. Participating agencies included FDOT, the Corps, FWS, the Southwest Florida Management District, the Florida Game & Fresh Water Fish Commission, and engineering and environmental consulting firms. Quarterly meetings were held to evaluate aspects of the project, including the avoidance and minimization of environmental impacts. As a result of the partnering process, the alignment of a portion of the road was altered and the overall length was shortened, thereby reducing wetland impact. The partnering process also resulted in the development of a mitigation plan, which

included the creation of eight wildlife under-crossings and the preservation of two areas--the 3,635-acre Anclote River Ranch and the 6,533-acre Serenova Tract.  In accordance with the plan, FDOT agreed to place a conservation easement on the mitigation property and to give $50,000 to the Southwest Florida Water Management District for wetland study and enhancement of the mitigation property.

Beginning in August, 1996, FDOT submitted several joint applications for the necessary permits, including the federal dredge and fill permit which is the responsibility of the Corps.  A single application for the entire project was not submitted.  Rather, FDOT submitted a separate application for each section of the Parkway.  Each application did, however, lay out both the entire scope of the project and the proposed mitigation plan.  The segmentation was done primarily in order to deal with surface and storm water concerns in the state permitting process.

Despite the manner in which they were submitted, the Corps regarded the applications as components of a single application, with subsequent sections to be treated as modifications to the original permit.  Although it did give separate public notice of each application, the Corps administered the applications through the use of a single permit number.  Sierra Club raised no objections during the public comment period on any of the segments of the application.

In September, 1996, the Corps initiated informal consultation with FWS, pursuant to Section 7 of the ESA, regarding the potential impact of the Parkway on several species, including the red-cockaded woodpecker, the Florida scrub jay, the eastern indigo snake, and the wood stork. The FWS responded that the proposed Parkway was not likely to affect any of the species except the eastern indigo snake. FWS then referenced its 1993 biological opinion and informed the Corps that "[t]he proposed compensation plan is consistent with the reasonable and prudent measures and terms and conditions of that opinion." It concluded by informing the Corps that its Section 7 consultation requirements had been fulfilled.

The Corps then prepared an environmental assessment for each of the four segments included in the application. In considering each section, the Corps defined the project in its entirety. Discussion of alternatives, avoidance, minimization, and compensation in the later EAs referred back to the earlier EAs as in each instance "the review was done for the entire 41.6-mile length of the road." The EAs also incorporated portions of the 1993 biological opinion, and specifically relied on the 1994 EIS, the extensive partnering process, and the mitigation plan. It is clear from the EAs, as well as other documentation in the administrative record, that the altered alignment of the road was adopted to further minimize the impact of Parkway.

After completing its review and assessing the potential environmental impacts, in January, 1997, the Corps determined that an EIS was not necessary and issued a FONSI for each segment included in the application. A single dredge and fill permit was issued to FDOT in December, 1997. Applications for later sections of the Parkway were treated as modifications to the original permit. Public notice was issued for each modification, and at no time did FWS or Sierra Club respond with any objections. Each modification was subsequently approved. Construction of the Parkway began in August, 1998.

Throughout the ten years of planning, there were at least 6 public notices issued. At no point throughout the process did Sierra Club respond or provide comments to the agencies involved. In October, 1998, Sierra Club initiated its first contact with the agencies by sending the Corps a notice of intent to sue. This was 22 months after the first FONSI was issued, ten months after the permits were issued, and two months after construction began.

Sierra Club filed its suit in March, 1999, alleging in part that the Parkway would, in fact, affect four species that the Corps had determined were not present in the project area: the Florida panther and three kinds of plants, the Brooksville bellflower, Cooley's water-willow, and Britton's bluegrass. In response to the suit, the Corps initiated a third consultation with FWS in order to confirm the earlier

18

determination that the project would not affect those four species. The Corps also requested confirmation that the 1996 consultation had included the entire project in its scope. FWS confirmed that the four species would not be adversely affected, the 1996 consultation covered the entire project, and that the Corps' Section 7 requirements had been fulfilled.

Sierra Club sought to enjoin further construction of the Suncoast Parkway not only because of the effects on the four species, but also due to alleged violations by the Corps of NEPA, the Administrative Procedure Act, the Clean Water Act, and the ESA. Because the Parkway was partially completed, FDOT intervened.[12] The district court denied Sierra Club a preliminary injunction, and we affirmed, on the grounds that the doctrine of laches precluded that extreme relief, and because Sierra Club had failed to demonstrate a sufficient threat of harm to any endangered or threatened species to justify an injunction.

All of Sierra Club's claims have since been resolved, with the exception of their claim that Section 7 of the ESA has been violated. Summary judgment with respect to the Section 7 claims was entered in favor of the Corps and FDOT, from which Sierra Club now appeals.

---

[12]After the initial denial of the preliminary injunction, Sierra Club amended its complaint to include the Secretary of FDOT as a defendant.

Sierra Club's primary argument on appeal is that the Corps failed to prepare a biological assessment as required by Section 7 of the ESA for all major construction activities. We first discuss that argument, and then turn to Sierra Club's remaining challenges.

## II.  DISCUSSION

### A.  The Biological Assessment

Sierra Club argues that the Corps was arbitrary and capricious in not preparing a biological assessment as part of the permit approval process. It asserts that the existence of the 1993 BA conclusively establishes that the Parkway is a major federal construction project which requires an agency to prepare a BA before taking action. In the alternative, it also argues that because the alignment of the road was changed, the Corps was required to develop a supplemental EIS and a new BA. Because we are satisfied that the Corps complied with the statutory requirements for a major construction activity, we can assume *arguendo* that the Parkway is a major federal action.[13]

---

[13]Thus, we need not address the Corps' suggestion that the permitting process is somehow divorced from the construction project itself, thus avoiding the "major" characterization. *But see Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (quoting *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974)) (establishing that a project is a federal action "if it cannot 'begin or continue without prior approval of a federal agency'"); *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) (same); *Goos v. I.C.C.*, 911 F.2d

As a preliminary matter, we must clarify the relationship between a biological assessment, as described in the ESA, and an environmental impact study, as described in NEPA. A BA is prepared in order to evaluate the impact of an action on an threatened or endangered species. The ESA specifically provides that the BA requirement can be fulfilled as part of the procedural requirements established by NEPA. 16 U.S.C. § 1536(c)(1). When an agency prepares an EIS, it is complying with the BA requirement, provided that one of the environmental impacts discussed is the impact on threatened and endangered species.[14]

Because the 1994 EIS does evaluate the impact of the road on listed species, the initial BA requirement was satisfied. If new information regarding endangered species became available, or if environmental consequences not already evaluated came to light, the Corps would have been required to prepare a new BA or an SEIS. It would not, however, have been required to prepare both. We will analyze Sierra Club's challenge first by demonstrating that the Corps complied with the

---

1283, 1294 (8th Cir. 1990) (agency has "legal control" over state project, and must comply with NEPA, when "some federal action 'is a legal condition precedent to accomplishment of an entire nonfederal project'"); *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 155 (D.C. Cir. 1985) (approval of a nonfederal project constitutes a federal action); 40 C.F.R. § 1508.18(b)(4) ("Major Federal action" includes "[a]pproval of specific projects, such as construction . . . activities located in a defined geographic area . . . . [including] actions approved by permit or other regulatory decision . . . .").

[14]It is not problematic that the Corps' administrative record does not include the 1993 BA. The 1994 EIS provides all of the necessary environmental information.

statutory requirements for a "major construction activity," and then by asking whether the Corps should have prepared a supplemental EIS.

The administrative record establishes that the Corps did fully comply with the requirements established by NEPA and the ESA for a major project with significant effects on the human environment. First, it acted as a cooperating agency in the preparation of the 1994 EIS. Second, it remained involved in the planning process throughout the development of the mitigation plan and the other methods to avoid and minimize the impact of the Parkway. Third, the Corps acted both efficiently and consistently with NEPA regulations by incorporating the previous studies into its current analysis. The 1997 EAs all incorporate portions of the 1993 biological opinion and rely the 1994 EIS, as well as the work done during the partnership process.[15] The initial 1997 EA, prepared January 6, 1997, extensively referred to and relied upon the 1994 EIS and the 1993 biological opinion. Indeed, the "reasonable and prudent measures" and "terms and conditions" detailed by FWS in the 1993 biological opinion were incorporated

_____

[15]Sierra Club argued below, and mentioned in passing on appeal, that the Corps is estopped from arguing that it adopted the 1994 EIS and the 1993 biological opinion. It asserts that the Corps failed to adhere to the regulations governing adoption of documents and incorporation by reference. We find that the Corps sufficiently complied with these regulations. The 1997 EAs state that this project is the same project discussed in the 1994 EIS. The EAs rely upon the 1994 EIS throughout. They also include verbatim the minimizing measures of the 1993 biological opinion, which provides clear evidence that the Corps was aware of, and did consider, the biological opinion when preparing the EAs.

22

verbatim, with notations describing the changes being made to increase the mitigating effects. Subsequent EAs in 1997 referred back to this January 6, 1997 EA and the 1994 EIS. Such reliance on a previous EIS is specifically authorized. Regulation 40 C.F.R. § 1502.20, entitled "Tiering" provides in relevant part:

> Whenever a broad environmental impact statement has been prepared . . . and a subsequent . . . environmental assessment is then prepared on an action included within the entire program . . . the subsequent . . . environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference . . . .

See also 40 C.F.R. § 1508.28; 50 C.F.R. § 402.12(g); 33 C.F.R. § 230.13(c).[16]

Thus, it is clear from the administrative record that the Corps had before it a full picture of the environmental consequences of the Suncoast Parkway. It concluded in the EAs that given the alterations to the project and the mitigation plan, the environmental impacts of the Parkway were no longer significant. We have previously affirmed the validity of such a decision, where, as here, the mitigation measures are a condition of agency approval. C.A.R.E. Now, Inc. v. F.A.A., 844 F.2d 1569, 1575 (11th Cir. 1988) ("When mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of

---

[16]Moreover, the fact that FHWA was the lead agency with respect to the 1994 EIS does not preclude reliance by the Corps. The Corps was a cooperating agency with respect to the 1994 EIS, and it may adopt an EIS after independent review. 40 C.F.R. § 1506.3(c); 33 C.F.R. § 230.21. It is clear from the instant record that the Corps amply fulfilled the independent review requirement in this case.

23

'significant impacts' is not reached so no EIS is required."). Given the mitigation and the beneficial alterations to the project, the Corps did not act arbitrarily and capriciously in determining that a supplemental environmental impact statement was not required. The Corps fully complied with its NEPA requirements. As the ESA provides that the BA requirement may be satisfied through NEPA procedures, the Corps also fulfilled its ESA requirements.

We also reject Sierra Club's alternate argument that the change in the road alignment created a substantially new project requiring a new BA (or, in the alternative, an SEIS). The new alignment did not create a new project. It altered the existing project in such a way as to further minimize its environmental impact. As the 1997 EAs explain, the new alignment of the road was adopted by the partnering organizations as a means of minimizing the impact described in the 1994 EIS. A 1996 letter from FWS to the Corps supports this conclusion. In the letter, the FWS informs the Corps that "[t]he proposed compensation plan is consistent with the reasonable and prudent measures and terms and conditions of [the 1993 biological] opinion." It was partly on this basis that FWS concluded that the Corps had fulfilled its Section 7 requirements. When an agency implements a minimizing measure, it is not automatically required to redo the entire environmental analysis. A supplemental EIS is required only when "the post-

24

[original EIS] changes in the [project] will have a 'significant' impact on the environment that has not previously been covered by the [original] EIS."  Nat'l Wildlife Fed'n v. Marsh, 721 F.2d 767, 782 (11th Cir. 1983); 40 C.F.R. § 1502.9(c)(1).  In the case of the realignment, the new route was entirely within the study area of the 1994 EIS.  Any environmental impacts from the new alignment were covered within the 1994 EIS.  Thus, the Corps was not required to undertake a new EIS.

Nor do we see any other changes to the Parkway project, made subsequent to the 1994 EIS, that are "significant," such as to require an SEIS.  The 1994 EIS, which included only a conceptual mitigation plan, envisioned the set-aside of 1795 acres of specific tracts for preservation, the acquisition of 45 acres for enhancement or restoration, and 165 acres for creation of new wetlands.  The changes made after 1994 minimize the impact of the road and focus on conserving wetlands, rather than altering the existing landscape.[17]  The final plan set aside

---

[17]Our prior precedent establishes that even where post-EIS changes are entirely beneficial, if they are significant, they require an SEIS. *Nat'l Wildlife Fed'n*, 721 F.2d at 782-83. Because we find that the post-EIS changes in this case are not significant, the continued wisdom of that holding is not an issue which confronts us.  However, we note that other circuits have questioned our decision. *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 n.1 (6th Cir. 1995); *River Rd. Alliance, Inc. v. Corps of Eng'rs of the U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985).  The requirements for environmental assessments have become more stringent in the years since the early 5th Circuit cases that govern our precedent and dictated the holding in *National Wildlife Federation*.  EAs are now generally considered "thorough enough to permit a higher threshold for requiring environmental impact statements." *River Rd. Alliance*, 764 F.2d at 451.  In addition, there has been a "growing awareness that routinely requiring such

10,168 acres for conservation, which encompasses a larger area surrounding the specific tracts identified in the 1994 EIS. Unlike the mitigation package in National Wildlife Federation v. Marsh, this conservation does not create "change in the character of the land itself." 721 F.2d at 783. By establishing conservation easements over tracts of land specifically purchased to compensate for the wetlands lost to the Parkway, the conservation portion of the mitigation plan does not create any significant impact on the environment. The mitigation plan also provides for wildlife underpasses, which is an alteration to the construction plans for the road, and also does not create a significant impact on the surrounding environment.

We note that considerable time and resources were saved by the partnership process. By contributing its input and maintaining involvement throughout the development of the Suncoast Parkway, the Corps not only developed an adequate record of the environmental consequences, but also helped ensure that the road would have as minimal an impact as possible. We are satisfied that the Corps fulfilled its statutory requirements under both the ESA and NEPA.

B. The Remaining Challenges

---

statements would use up resources better spent in careful study of actions likely to harm the environment substantially." *Id.*

26

Sierra Club makes three additional claims which are essentially challenges to decisions by other agencies. Sierra Club bears a difficult burden in proving the Corps was arbitrary and capricious in relying on these decisions, which were entirely within those agencies' areas of expertise.

First, Sierra Club argues that the Corps was arbitrary and capricious in relying upon the FWS "no jeopardy" finding. The basis of this argument is that the Corps did not consider, and did not submit to FWS, the effects of the Ridge Road extension and the Cone borrow pit on the mitigation plan for the Parkway.[18] Neither FWS nor its administrative record is before this Court, so it is impossible, and inappropriate, to speculate about what that agency did or did not consider. Sierra Club bears a heavy burden to prove that the Corps was arbitrary and capricious in relying upon the FWS determination of a matter firmly within that agency's area of expertise. It is a burden they have not met.

Second, Sierra Club challenges the adequacy of the Corps' consultation with

---

[18]Sierra Club does not argue that the segmented applications constituted separate applications, and as noted in the text the entire scope of the project was considered. Sierra Club makes its segmentation argument primarily with respect to Ridge Road and the Cone borrow pit, but as we note *infra* Sierra Club has failed to provide record support for its argument. Thus, we need not address whether Ridge Road and the Cone borrow pit were properly segmented either because there was no irretrievable commitment, *see Friends of the Earth v. Coleman*, 513 F.2d 295, 299 (9th Cir. 1975); because they were not inextricably intertwined to the Parkway project, *see Port of Astoria, Or. v. Hodel*, 595 F.2d 467, 477 (9th Cir. 1979); because they each have an independent utility, *see Friends of the Earth v. Coleman*, 518 F.2d 323, 328-29 (9th Cir. 1975); or because the project was otherwise properly segmented.

FWS concerning the Florida panther and three protected plant species, the Brooksville bellflower, Cooley's water-willow, and Britton's beargrass. Even though none of the surveys conducted between 1994 and 1996 found any of these species in or near the action area, Sierra Club argues that the Corps was required to initiate formal consultation. The basis of its argument is that FWS had in its possession a recovery plan for the plants which concluded that a major threat to those plants was the Suncoast Parkway. Again, neither the FWS nor its administrative record is before this Court. It is insufficient for Sierra Club to allege that the FWS decision to concur with the Corps' assessment was arbitrary and capricious. Instead, Sierra Club must prove that the Corps was arbitrary and capricious in relying upon the FWS decision. Since the surveys for the Parkway concur with the FWS decision, the Corps had sound reasons for relying upon it. Sierra Club has not met their burden of proof.

Sierra Club's third argument is that the Corps acted arbitrarily and capriciously in adopting the "action area" as it was defined by the FHWA and state agencies in the 1994 EIS. Absent evidence to the contrary, we presume that an agency has acted in accordance with its regulations. Nicholson v. Brown, 599 F.2d 639, 649 (5th Cir. 1979) ("Administrative action . . . comes before the courts clothed with a presumption of regularity."). The Corps acted as a cooperating

28

agency in the development of the 1994 EIS, which originally defined the action area. In such a situation, the Corps' regulations require the district engineer to coordinate with a lead agency to "insure that agency's resulting EIS may be adopted by the Corps for purposes of exercising its regulatory authority." 33 C.F.R. Pt. 325, App. B § 8(c). This necessarily includes appropriately defining the scope of the action. In addition, NEPA regulations require an agency to undertake an independent review of a lead agency's EIS before adopting it. 40 C.F.R. § 1506.3(c). If the Corps undertook no independent consideration of the appropriate scope of the action area, it would be in violation of both NEPA and its own regulations. See 40 C.F.R. § 1506.3; 33 C.F.R. Pt. 325, App. B § 8(c). However, it is apparent from the administrative record that the Corps amply fulfilled its independent review duty. Moreover, we presume that the Corps complied with all regulatory requirements; Sierra Club has adduced no evidence to the contrary. Thus, Sierra Club has failed to overcome the presumption that the Corps contributed to, and concurred with, the definition of the action area.

## III. CONCLUSION

We are satisfied that the Corps took a "hard look" at the environmental consequences of the Suncoast Parkway, and that its determinations were not

arbitrary and capricious. The administrative record establishes that the Corps fully complied with the related procedural requirements established by NEPA and the ESA for major federal projects. Thus, we AFFIRM the grant of summary judgment to the Corps and FDOT on the ESA Section 7 claims.

**AFFIRMED.**