NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 7 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SWAN VIEW COALITION; FRIENDS OF THE WILD SWAN, INC.; NATIVE ECOSYSTEMS COUNCIL; ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> CHIP WEBER, Flathead National Forest Supervisor; FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, <br><br> Defendants-Appellees. | No.    19-35004 <br><br> D.C. No. 9:13-cv-00129-DWM <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted July 10, 2019
Seattle, Washington

Before:  BERZON and WATFORD, Circuit Judges, and ROTHSTEIN,[**] District

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Judge.

Plaintiffs-appellants (collectively, "Swan View") appeal the district court's rulings rejecting various challenges to the U.S. Forest Service's Glacier Loon Project (the "project"). For the reasons below, we affirm in part but remand to the district court for further proceedings concerning whether the Forest Service plans to abide by certain restrictions imposed by the Swan Valley Grizzly Bear Conservation Agreement (the "Swan Valley Agreement") beyond 2020.

1.  Biological assessment for wolverines:

Because wolverines are proposed to be listed under the Endangered Species Act and are present in the project area, the Forest Service had to determine whether the project is "likely to jeopardize the continued existence" of the wolverine; if so, the Forest Service was required to "confer" with the U.S. Fish and Wildlife Service. 16 U.S.C. § 1536(a)(4). The Forest Service also had to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by" the project. *Id.* § 1536(c)(1).

Assuming that the statute's "biological assessment" requirement applies to species that are proposed to be listed, the Forest Service satisfied that requirement

---

**       The Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

2

here.[1] Pursuant to its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, the Forest Service analyzed the effects of the project on wolverines, including effects on natal denning security, prey base, and overall habitat security, as well as cumulative effects. The Forest Service concluded that the project would "not likely contribute to a trend towards Federal listing or loss of viability to the population or species," and "would not result in a jeopardy determination for the wolverine." The NEPA documentation thus fulfilled the purpose of the Act's "biological assessment" requirement with respect to the wolverine, a "proposed" species: It helped the Forest Service determine whether the project was "likely to jeopardize the [wolverine's] continued existence," and thus whether the agency had to confer with the Fish and Wildlife Service. 16 U.S.C. § 1536(a)(4); *see id.* § 1536(c)(1) (permitting agencies to undertake a biological assessment "as part of [their] compliance with [NEPA]").

---

[1] The parties disagree about whether the Fish and Wildlife Service's regulation, 50 C.F.R. § 402.12, which sets forth procedures for conducting a biological assessment, applies here, given that the project is not a "major construction activit[y]," *id.* § 402.12(b)(1). It may well be that the "major construction activities" language is not a broad limitation on the applicability of the regulation but an explanation of how the regulation applies to such activities in particular. If so, then the regulation does not relieve agencies of the obligation to conduct a biological assessment for actions other than "major construction activities." *See Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1213 (11th Cir. 2002); *Ctr. for Food Safety v. Johanns*, No. Civ. 03-00621 JMS/BMK, 2006 WL 2927121, at *5 (D. Haw. Oct. 11, 2006). The issue was not extensively briefed, however, and, given our conclusion that the Forest Service complied with the regulation if it applies, we need not decide the question.

Swan View argues that the regulation required the Forest Service to obtain the Fish and Wildlife Service's concurrence in the findings of the biological assessment. *See* 50 C.F.R. § 402.12(j), (k)(1). In addition to the NEPA documentation discussed above, the Forest Service prepared a programmatic biological assessment that discussed the effects on wolverines of "projects routinely conducted on National Forest System lands," such as "Timber Harvest." The programmatic assessment cited the Fish and Wildlife Service's proposed rule to list wolverines as threatened under the Endangered Species Act, which identified three threats to the species: climate change, trapping, and small population size. 78 Fed. Reg. 7864, 7886 (Feb. 4, 2013). The proposed rule concluded that there was no "evidence to suggest that land management activities"—such as "timber harvest"—"are a threat to the conservation of the species." *Id.* at 7879. Based in part on that conclusion, the Forest Service determined, in its programmatic assessment, that routine Forest Service activities, including timber harvest, "(individually and/or cumulatively) are not considered a threat to [the wolverine population] and are not likely to jeopardize the continued existence" of the species. The Fish and Wildlife Service concurred in that determination.

The Fish and Wildlife Service's concurrence in the programmatic biological assessment was sufficient in these circumstances to satisfy any concurrence

4

requirement prescribed by the regulation, assuming there is such a requirement. *See* 50 C.F.R. § 402.12(j), (k)(1). Unlike a biological assessment for *listed* species—which ultimately must indicate whether those species "are likely to be adversely affected by the action," in which case the Fish and Wildlife Service must prepare a biological opinion, *id.* § 402.12(k)(1); *see id.* § 402.14(a), (b), (g)—a biological assessment for proposed species results in a determination whether the action is "likely to jeopardize the continued existence" of the species, *id.* § 402.12(k)(1). In light of that distinct purpose, it is enough here that the Fish and Wildlife Service concurred in the Forest Service's determination that the types of activities that comprise the project do not, individually or cumulatively, threaten the wolverine population, and are therefore not likely to jeopardize its existence.

     2.     <u>Effects on grizzly bears</u>:

Under Endangered Species Act regulations, the Forest Service was required to enter into formal consultation with the Fish and Wildlife Service unless it determined that the project was "not likely to adversely affect" the grizzly bear, a listed species. 50 C.F.R. § 402.14(a), (b)(1). Here, the Forest Service determined that the project itself was not likely to adversely affect grizzly bears, but that the baseline road density in the project area was adversely affecting bears. The Forest Service therefore issued an overall determination that the project, when added to the baseline, *was* "likely to adversely affect" the grizzly bear. As a result, the two

5

agencies entered into formal consultation, and the Fish and Wildlife Service produced a "biological opinion" concluding that the project was "not likely to jeopardize the continued existence of grizzly bears." As the agencies have engaged in formal consultation, Swan View's challenge to the Forest Service's "adverse effects" determination cannot succeed.

Swan View also challenges the Fish and Wildlife Service's finding of no adverse effects, which we construe as a challenge to that agency's determination, in its biological opinion, that the project would not cause incidental take of grizzly bears beyond the level of take caused by the baseline conditions. Swan View has not shown that that determination was arbitrary and capricious. Although road density will increase temporarily during the project, the figures cited by Swan View are "worst case scenario" estimates that represent what would happen if all the project activities occurred at the same time. The Forest Service concluded that that possibility was "eliminat[ed]" by the project's compliance with timing restrictions on logging imposed by the Swan Valley Agreement. As a result of those restrictions, the "majority of the activities would occur during the denning period for bears," reducing the likelihood of displacing bears during their active period.

Swan View has not established that the Tenmile Project or the Beaver Creek Project is comparable to the project here at issue with regard to the impact on

grizzly bears, and so has not shown why it was unreasonable for the Fish and Wildlife Service to conclude that those projects would result in additional incidental take but this one would not.

We therefore conclude that the agencies have satisfied their Endangered Species Act obligations with respect to the grizzly bear, so long as the project parameters remain consistent with those analyzed in the biological opinion.

3.    Timing of project:

Most of the harvest activity will occur in the Glacier Loon subunit, and the Fish and Wildlife Service assumed in its biological opinion that the restrictions imposed by the Swan Valley Agreement on "inactive" subunits would apply to that harvest activity. The biological opinion was issued in 2015, the project is expected to last approximately five years (with most of the harvest activity occurring in the first two years), and the Glacier Loon subunit is designated as inactive from 2015 through 2020.

Given the passage of time, however, it is possible that not all harvest activity in the Glacier Loon subunit will have been completed by the end of 2020. If the Forest Service were to conduct harvest activity in that subunit after 2020 without abiding by the restrictions applicable to an inactive unit, the biological opinion would no longer be an adequate evaluation of the "effects of the action," 50 C.F.R. § 402.14(g)(3), as it relies on the assumption that the restrictions will be in place.

We therefore remand for further proceedings concerning whether the Forest Service plans to conduct harvest activity in the Glacier Loon subunit inconsistent with the restrictions applicable to an inactive unit under the Swan Valley Agreement, and, if so, for consideration whether to issue an injunction requiring the Forest Service to reinitiate Endangered Species Act consultation with the Fish and Wildlife Service with respect to grizzly bears.

4.      Amendment 19 contentions:

We agree with the Forest Service that under Amendment 19 the agency need not achieve the objectives in a single project. It is reasonable for the agency to achieve them through a combination of projects. The project complies with the Amendment's road-density standards applicable to each Forest Service action because the project will "result in a net gain towards meeting" the objectives.

5.      Canada lynx:

We grant Swan View's request that we vacate the portions of the district court's rulings addressing reinitiation of Endangered Species Act section 7 consultation on critical habitat for Canada lynx. *See All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1032 (9th Cir. 2018). We therefore vacate the discussion of that issue at the following citations: *Swan View Coal. v. Weber*, No. CV 13-129-M-DWM, 2016 WL 160654, at *7 (D. Mont. Jan. 13, 2016); *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1133, 1152-53 (D. Mont. 2014).

**AFFIRMED in part; VACATED in part; and REMANDED for further**

**proceedings consistent with part 3 of this memorandum.**