[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-13934

_____

Docket- FAA

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 31, 2005
THOMAS K. KAHN
CLERK

CITY OF OXFORD, GEORGIA,

Petitioner,

versus

FEDERAL AVIATION ADMINISTRATION,
MARION C. BLAKELY, Administrator
of the Federal Aviation
Administration,

Respondents,

CITY OF COVINGTON, GEORGIA,
GEORGIA DEPARTMENT OF TRANSPORTATION ("GDOT")

Intervenors.

_____

Petition for Review of an Order of the
Federal Aviation Administration

_____

**(October 31, 2005)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and LIMBAUGH[*], District
Judge.

_____

[*]Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of
Missouri, sitting by designation.

TJOFLAT, Circuit Judge:

The City of Oxford, Georgia petitions this court to review the Federal Aviation Administration's ("FAA") order approving revisions to the Airport Layout Plan ("ALP")[1] at the Covington Municipal Airport.[2]  The City asserts that the FAA failed adequately to assess the environmental impacts of the airport renovation project proposed in the ALP, as required by the National Environmental Policy Act ("NEPA"), and that the FAA failed to comply with the procedural requirements imposed by the National Historic Preservation Act ("NHPA") for analyzing the project's impacts on historic properties.  We find that the FAA fulfilled its obligations under NEPA and the NHPA, and therefore deny

---

[1]An ALP is a document which shows "[p]roposals to construct new runways, runway extensions, terminal buildings, or other major and supportive development."  FAA Order 5050.4A ¶ 30(b) (1985).  The FAA must approve revisions to the ALP.  49 U.S.C. § 47107(a)(16)(B).  The City of Covington sought to obtain FAA approval of its revision to the ALP before it physically modified the airport.  See 49 U.S.C. § 47107(a)(16)(C)("[T]he owner or operator will not make or allow any alteration of the airport if the alteration does not comply with the plan the Secretary approves, and the Secretary is of the opinion that the alteration may affect adversely the safety, utility, or efficiency of the airport.")

[2]49 U.S.C. § 46110(a) grants this court jurisdiction to review final orders of the FAA.  This section provides, in relevant part:

> [A] person disclosing a substantial interest in an order issued by . . . the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator . . . may apply for review of the order by filing a petition for review . . . in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

49 U.S.C. § 46110(a).  The City of Oxford has a substantial interest in the FAA's order because, as indicated in the following text, the City abuts the Covington Municipal Airport.

the petition for review.

I.

The Covington Municipal Airport is a regional airport located in the City of Covington, Georgia.[3]  The airport's western boundary abuts the city limits of the City of Oxford.  Oxford is a small town with a historic district listed on the National Register of Historic Places.  The historic district is located a few miles southeast of the airport and contains Oxford College of Emory University.  In addition, the United Methodist Church deems the city to be a "Methodist Shrine," the only city in the United States so designated, and thus considers Oxford to be of historical significance.

Covington endeavors to renovate the airport so that it may better serve Covington and the surrounding communities.  The proposed renovations accord with the Georgia Aviation System Plan ("GASP"), which the Georgia Department of Transportation ("GDOT") promulgated in an effort to respond to Georgia's current aviation needs.  An ostensible goal of the GASP is to provide, within a forty-five minute drive of each Georgia community, an airport capable of landing 95% percent of the business and corporate aircraft fleet.

---

[3]The airport consists of a runway, a taxiway, a terminal building and 10 automobile parking spaces.

The GASP classifies each Georgia airport as a Level I, Level II or Level III airport.[4]  Level III airports are the most highly developed airports and are defined as "general aviation airports of regional significance capable of accommodating commercial aircraft or a variety of business and corporate jet aircraft."  According to the GASP Executive Summary, published in 2001, "a minimum runway length objective of 5,500 feet has been established [for Level III airports]."  The Executive Summary goes on to state that "ideally, operations at Level III airports should also be aided by a precision instrument approach."[5]  Other "objectives" identified by the GASP for Level III airports include a minimum runway width of 100 feet and a 2,500 square foot minimum terminal/administrative building with public restrooms, a conference area and a pilot's lounge.

The Covington Municipal Airport is classified as a Level III airport and has a runway 4,203 feet long and seventy-five feet wide.  To meet the GASP objectives, Covington seeks to extend the runway by approximately 1,300 feet

---

[4]The Level I, Level II and Level III classifications existed before the GDOT promulgated the GASP.  The GASP retains this nomenclature and sets objectives regarding the types of facilities that airports in each category should possess.

[5]Precision instrument approach provides accurate lateral and vertical guidance for long, wide runways and permits landings with low visibility.  See generally Thomas A. Horne, Precision Approaches: Riding the Rails to 200 and a half in Instrument Insights: Techniques for Precise Flying, AOPA PILOT MAGAZINE, available at http://www.aopa.org/pilot/features/ii_9805 (last visited Oct. 12, 2005).

and to widen it by twenty-five feet.  After this is done, Covington plans to extend the parallel taxiway.  The extension and widening of the runway, along with the extension of the parallel taxiway, are the only airport modifications to which funds have been committed.  The GDOT is providing 75% of the funding, with Covington providing the additional 25%.

Covington sought FAA approval for these modifications,[6] and it hired an independent contractor, Wilbur Smith Associates, to prepare an Environmental Assessment ("EA") discussing the environmental impacts of the proposed modifications.  Wilbur Smith studied four alternatives: extending the eastern end of the runway, extending the western end of the runway, extending both ends of the runway and "no-build."[7]  Its EA concluded that the extension of the eastern end of the runway, which Covington preferred to the other alternatives, would be the least disruptive of the three "build" alternatives.[8]

While Wilbur Smith conducted its study, Covington sponsored

---

[6]In addition to these modifications, Covington sought FAA approval to relocate visual approach descent indicators, install an Airport Weather Observation System, relocate the runway protection zone, re-grade runway safety areas and install a Medium Intensity Approach Lighting System.

[7]The no-build alternative was that the project would not go forward.

[8]The EA stated that extending the eastern end of the runway would "not result in any significant environmental impacts."  It concluded that the two other "build" alternatives would, on the other hand, "result in significant socioeconomic impacts" and would "conflict with the land use plan for Oxford."

archaeological and historical surveys to determine whether the project affected sites of historical or archaeological significance. These surveys, which were completed in June 2000, concluded that no historical or archaeological resources would be impacted by the project. In November 2001, the FAA sent a letter to the Historic Preservation Division ("HPD") of the Georgia Department of Natural Resources[9] asking it to concur with the determination that the project would not affect historic properties. The HPD responded in May 2002; it requested that the FAA consult with the City of Oxford, Emory University, and the North Georgia Conference of Methodist Churches. These parties had written letters and placed telephone calls to the HPD seeking to become "consulting parties."

The FAA held a "special interest" meeting for the City of Oxford, Emory University and the North Georgia Conference of Methodist Churches on July 16, 2002. This meeting came on the heels of Wilbur Smith's release of the first Draft EA. One week later, on July 23, the FAA held a public hearing at the airport, receiving comments from those in attendance and the City of Oxford.

The HPD contacted the FAA in September 2002 to state that it could not comment on the Draft EA and to suggest that Covington revise its noise estimates. Covington followed this suggestion and revised its aviation forecasts through the

---

[9]The HPD is Georgia's State Historic Preservation Officer ("SHPO").

year 2020. Then, on January 10, 2003, the FAA held a special interest meeting to discuss noise impact.

The FAA transmitted the result of Covington's revised noise analysis to the HPD. The result was that no historical, residential or other sensitive areas would suffer adverse auditory effects from the project. The HPD responded to the FAA's transmittal on April 17, 2003, stating that it could not reach a conclusion regarding auditory effects of the project. It suggested that the FAA consult with the United States Advisory Council on Historic Preservation ("ACHP"). The FAA sent a letter to the ACHP on April 30, 2003, requesting that the ACHP defer to the finding that the project would not create any adverse auditory effects. The ACHP responded that the FAA was "free to continue with its review of this undertaking under determination that expansion of Covington's new runway will have no adverse visual effect, and [that] there will be no noise effects, to historic properties."[10]

On July 8, 2004, the FAA issued a Finding of No Significant Impact ("FONSI") and Record of Decision ("ROD"), approving Covington's proposed

_____

[10]The ACHP prefaced its response by claiming that it had "no authority to overturn an agency's finding of no effect or no adverse effect." It based this conclusion on a September 19, 2001, decision by the U.S. District Court for the District of Columbia, which invalidated certain NHPA regulations. See Nat'l Mining Ass'n v. Slater, 167 F. Supp. 2d 265 (D.D.C. 2001), rev'd, Nat'l Mining Ass'n v. Fowler, 324 F.3d 752 (D.C. Cir. 2003). The ACHP concurred, however, with the standards the FAA used in assessing noise impacts.

project. The FONSI concluded that the proposed project would not significantly impact the environment and included a finding of no adverse effect on historic properties. The City of Oxford received copies of the Final EA and the FONSI/ROD on July 21, 2004, and promptly filed the petition for review now before us.

In support of its petition, the City of Oxford (the "Petitioner") contends that the FAA violated NEPA by (1) failing to assess the environmental impacts of the proposed project in conjunction with relocation of Georgia Highway 142 ("S.R. 142") and the construction of a new terminal building; (2) failing to assess the air quality in light of the fact that the airport is located in a county that is not "in attainment" for air quality standards;[11] and (3) exercising insufficient oversight over Wilbur Smith in its preparation of the EA. Petitioner argues that the FAA violated the NHPA by (1) failing properly to involve consulting parties; and (2) failing adequately to consider the project's adverse auditory effects on historic properties.

## II.

---

[11]Petitioner contends that the FONSI did not contain an adequate air quality assessment because the assessment was based on the assumption that Newton county, the county in which the airport is located, was "in attainment" for air quality. Petitioner points out that Newton County is no longer in attainment; thus, it argues, the FAA erred in indulging that presumption. Petitioner admits, however, that the FAA actually reassessed the project's impacts on air quality. Given this admission, the issue is moot and will not be further addressed.

We review an agency's final decision to determine whether it is arbitrary and capricious. 5 U.S.C. § 706.[12] See also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375-76, 109 S. Ct. 1851, 1860, 104 L. Ed. 2d 377 (1989) (holding that federal courts apply the "arbitrary and capricious" standard, as opposed to the "reasonableness" standard, when reviewing final agency decisions under the Administrative Procedure Act). This standard of review provides the reviewing court with very limited discretion to reverse an agency's decision. North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538-39 (11th Cir. 1990). The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise. Id. at 1539.

In the NEPA context, the reviewing court must ensure that the agency took a "hard look" at the environmental consequences of the project. Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002). The agency need not have reached the same conclusion that the reviewing court would reach; the agency must merely have reached a conclusion that rests on a rational basis.

---

[12]The Administrative Procedure Act provides, in relevant part:
The reviewing court shall . . .
    (2) hold unlawful and set aside agency action, findings and conclusions found to be –
        (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .
5 U.S.C. § 706.

Id. The reviewing court may overturn an agency's decision only if:

> (1) the decision does not rely on factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

Id. We therefore review the FONSI/ROD only to determine whether the FAA adequately assessed the project's impacts in accordance with statutory requirements and reached rational conclusions based on the evidence gathered.

A.

NEPA imposes procedural requirements upon federal agencies to ensure that they adequately assess the environmental impacts of actions they undertake. 42 U.S.C. § 4332(2)(C).[13] See also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756, 124 S. Ct. 2204, 2209, 159 L. Ed. 2d 60 (2004) ("NEPA imposes only procedural requirements on federal agencies . . . ."); Sierra Club v. U.S. Army Corps. Of Eng'rs, 295 F.3d at 1214 ("NEPA creates a 'particular bureaucratic

---

[13]§ 102(2)(C) of NEPA provides, in relevant part:
(2) [A]ll agencies of the Federal Government shall . . .
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –
(i) the environmental impact of the proposed action . . . .
42 U.S.C. § 4332(2)(c). This requirement applies when an agency approves a specific project, such as the one in this case. 40 C.F.R. § 1508.18.

decisionmaking process.'") (quoting <u>Sierra Club v. Marsh</u>, 872 F.2d 497, 497 (1st

Cir. 1989)).  To comply with NEPA, an agency must first prepare an EA.  40

C.F.R. § 1501.4.  An EA is a brief document that allows the agency to determine

whether to prepare a more detailed statement of environmental consequences,

known as an Environmental Impact Statement ("EIS").  40 C.F.R. § 1508.9.[14]  If

the agency decides that the environmental consequences of the action are not

sufficient to justify the preparation of an EIS, the agency must prepare a FONSI

detailing why further environmental research is not justified.  40 C.F.R. §

1501.4(e).[15]

1.

NEPA requires a federal agency to analyze the cumulative impacts of a

proposed project in conjunction with any other, related actions.  40 C.F.R. §

---

[14]The NEPA regulations provide:
"Environmental assessment":
(a) Means a concise public document for which a Federal agency is responsible
that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to
prepare an environmental impact statement or a finding of no significant impact . .
. .
(b) Shall include brief discussions of the need for the proposal, of alternatives . . .,
of the environmental impacts of the proposed action and alternatives, and a listing
of agencies and persons consulted.
40 C.F.R. § 1508.9.

[15]The NEPA regulations provide: "'Finding of no significant impact' means a document
by a Federal agency briefly presenting the reasons why an action . . . will not have a significant
effect on the human environment . . . ."  40 C.F.R. § 1508.13.

1508.27.[16]  This requirement prevents a proponent from breaking a proposal into small pieces that, when viewed individually, appear insignificant but that are significant when viewed as a whole.  40 C.F.R. § 1508.27(b)(7) ("Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.").  The NEPA regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."  40 C.F.R. § 1508.7.  An agency, therefore, must only consider the environmental impacts of future actions that are foreseeable.

The inquiry into whether a future action is foreseeable should be conducted with an eye toward the purposes underlying NEPA.  NEPA contains an implicit "rule of reason," "which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."  Public Citizen, 541 U.S. at 767, 124 S. Ct. at

---

[16]The NEPA regulations provide:
"Significantly" as used in NEPA requires considerations of both context and intensity:
. . .
(b) . . . The following should be used in evaluating intensity:
. . .
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.
40 C.F.R. § 1508.27.

12

2215 (2004). This "rule of reason" requires an agency to conduct the NEPA process with a view to the purposes underlying NEPA. See id. NEPA serves two purposes:

> First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

Id. at 768, 2215-16 (alteration in original) (citations omitted) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845, 104 L. Ed. 2d 351 (1989)). See also North Buckhead Civic Ass'n, 903 F.2d at 1540 (discussing the "twin aims" of NEPA). An agency must consider the cumulative impacts of future actions only if doing so would further the informational purposes of NEPA. Restricting cumulative impact analysis to foreseeable future actions ensures that the details of these actions are sufficiently concrete for the agency to gather information useful to itself and the public.

a.

Petitioner contends that the FAA should have considered the cumulative impacts that would result from the proposed project and the relocation of S.R. 142

13

because the installation of ground-based navigational aids required for precision instrument approach would necessitate the relocation of the road. At one point, Covington had considered installing navigational aids for the airport to meet the objectives set forth by the GASP. Covington ultimately reached the conclusion that the implementation of precision instrument approach would prove infeasible because it would require the realignment of S.R. 142 and considerable land acquisition through eminent domain.[17]

There is simply not enough evidence that the relocation of S.R. 142 will ever occur to justify the assessment of its environmental impacts. In fact, S.R. 142 is currently being widened in its present location. The widening of a road in its current location hardly indicates an intention to thereafter move the road to a new location.

If Covington chooses to pursue a precision instrument approach at some point in the future, there is no guarantee that it would require the relocation of S.R. 142. A myriad of possible scenarios could accompany a future decision to implement precision instrument approach . For example, technological innovations, such as Global Positioning System ("GPS"), could allow the airport

_____

[17]In addition, the city determined that the runway's sloping terrain would make the installation of the navigational aids impracticable.

to be equipped with precision instrument approach in the future without

undergoing the same costly steps that are currently necessary.[18]

By broadly recommending that Level III airports possess a precision

instrument approach, the GDOT in no way bound Covington to relocate a major

highway, and it is clear that Covington chose not to pursue this option.  If

Covington chooses to install precision instrument approach in the future, there is

no guarantee that it would necessitate the relocation of S.R. 142.  The FAA would

have no basis upon which to assess the environmental impacts of such a project,

other than pure speculation.  Requiring the FAA to assess the impacts associated

with the implementation of precision instrument approach would serve no purpose

within the NEPA framework.

b.

Petitioner goes on to argue that the FAA should have considered the

_____

[18]GPS is a satellite based navigational system.  It works through a receiver that decodes information from a series of satellites.  This information allows the receiver to measure the distance between it and the satellites and, thus, to determine its latitude, longitude and height. See Generally Richard B. Langley, In Simple Terms, How Does GPS Work? (Mar. 27, 2003), available at http://gge.unb.ca/Resources/HowDoesGPSWork.html (last visited Aug. 26, 2005).
Covington expected that, at some point, GPS technology would allow airports to provide precision instrument approach without installing costly ground-based navigational aids.  As of the time the EA was prepared, GPS technology had not progressed to the point that it could be used for general aviation airports.  The EA does note, however, that "precision GPS approach will be implemented [for Covington Municipal Airport] at a later date if it is found to be feasible."

cumulative impacts of the proposed project in conjunction with the construction of a new terminal building at the airport. Covington's Airport Layout Plan Narrative ("ALP Narrative")[19] identifies the construction of a new terminal building as a "key component in the future development of airport facilities." The ALP Narrative goes on to note that the terminal building "should have a minimum of about 3000 square feet available."[20] The ALP Narrative states that the airport currently devotes only 1,960 square feet of space to serve as a terminal.[21]

Petitioner fails to show that Covington has prepared a specific plan for constructing a new terminal building. Covington did not seek FAA approval for the construction of a new terminal building as part of its proposed revisions to the ALP. While NEPA regulations aim to prevent proponents from "terming an action

---

[19]The title page to this document states that it is the "Airport Layout Plan Narrative." In the document itself, it is referred to as the "Airport Layout Plan Update." Regardless of what it is called, it is not the ALP which the FAA has approved. Rather, it is a narrative attached to the draft ALP submitted to the FAA by Covington. See FAA Airports Division for the Southern Region, Airport Layout Plan (ALP) Review and Approval: A Guide for ADO Program Managers § VIII.B.1 (discussing the circumstances in which "[a] Narrative Report should be submitted along with the draft ALP").

[20]According to the GASP objectives, Level III airports should contain a terminal/administrative building of at least 2,500 square feet. There is no explanation offered in the ALP Narrative for the 500 square foot discrepancy between the GASP objective and the ALP Narrative recommendation.

[21]The EA notes that the airport contains a 20,000 square foot terminal/administrative building. We assume this to be a typographical error and that the drafter of the EA intended to state that the airport contains a 2000 square foot terminal building.

temporary or breaking it into small component parts," 40 C.F.R. § 1508.27(b)(7), the construction of a new terminal building would be a separate project from the proposed modifications such that it would be completely reasonable to perform the proposed modifications without constructing a new terminal building. See Airport Neighbors Alliance v. U.S., 90 F.3d 426, 430 (10th Cir. 1996).[22] The only leg on which Petitioner's argument stands comes in the form of a general statement in the ALP Narrative, identifying a new terminal as a "key component" to the development of the airport, found amidst a laundry list of recommendations which seem to derive directly from the GASP. This statement, standing alone, does not show that the construction of a new terminal building is foreseeable.

---

[22]In Airport Neighbors Alliance , the 10th Circuit held that "the test for determining whether particular actions could be considered cumulative impacts of the proposed action [is] whether the actions were 'so interdependent that it would be unwise or irrational to complete one without the others.'" 90 F.3d at 430 (quoting Webb v. Gorsuch, 699 F.2d 157, 161 (4th Cir. 1983)). In addition to quoting Webb, the Tenth Circuit cited Sierra Club v. Froehlke, 534 F.2d 1289 (8th Cir. 1976) and Trout Unlimited v. Morton, 509 F.2d 1276 (9th Cir. 1974), both of which were also cited in Webb. Froehlke and Trout Unlimited, however, were decided prior to the promulgation of the NEPA regulations, which were first issued in 1978, and are therefore persuasive only to the extent that they do not conflict with the regulations.

The regulations ask whether future actions are foreseeable, not whether they are interdependent. The standard adopted in Airport Neighbors Alliance, therefore, cannot be the proper standard. While interdependent actions may also be foreseeable, we must be faithful to the text of the regulations by not assuming that interdependency is the sole consideration in determining whether an action is foreseeable. The determination of whether a future action is foreseeable turns on the specific facts of the case. The interdependence of proposed actions with potential future actions should be considered alongside other pertinent facts and circumstances to determine whether there is a sufficient likelihood that an action will occur to render that action foreseeable. See Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 181-82 (3rd Cir. 2000) ("[A] court must also consider the likelihood that a given project will be constructed along with the interdependence of other projects.").

With no concrete plan to consider and little indication that Covington plans to construct a new terminal building, investigators and researchers would be forced to analyze the environmental impact of a project, the parameters and specifics of which would be a mere guess.  This result contravenes the NEPA purposes of providing the agency and the public with accurate and relevant information.  The construction of a new terminal building is not a foreseeable action under  NEPA.[23]

### 2.

Petitioner claims that the FAA failed to exercise sufficient oversight over Wilbur Smith, the independent contractor that prepared the EA.  The NEPA regulations explicitly provide for a situation in which "an agency permits an applicant to prepare an environmental assessment" and require only that the agency "make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."  40 C.F.R. § 1506.5(b).  See also C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569, 1571 (11th Cir. 1988) (denying petition for review where the FAA based its FONSI on

---

[23]If, in time, Covington seeks FAA approval to revise its ALP to show a proposed plan to construct a new terminal building, the FAA may then be required to analyze the cumulative impacts of that project in conjunction with the project currently at issue.  See 40 C.F.R. § 1508.7 ("'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past . . . actions . . . .").  Until then, environmental analysis would be premature.

an EA prepared by an independent contractor hired by the project's proponent). The FAA evaluated and signed the EA, and we refuse to hold the FAA to any higher standard than that required by the NEPA regulations.

B.

Like NEPA, the NHPA imposes purely procedural requirements. It requires an agency to "take into account" the effect of any "undertaking" on historical sites. 16 U.S.C. § 470f.[24] The first step in the NHPA process involves consultation. The agency begins by consulting with the SHPO. 36 C.F.R. § 800.3(c)(3). In addition, the agency must attempt to involve the public in the process and to identify "consulting parties." 36 C.R.F. § 800.3(e)-(f).[25]

If the agency determines that the undertaking will not affect any historic properties, it must provide documentation of this finding to the consulting parties

---

[24]The NHPA provides, in relevant part:
[T]he head of any Federal department . . . having authority to license any undertaking shall, . . . prior to the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.
16 U.S.C. § 470f. The NHPA regulations define "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

[25]The NHPA regulations provide that "[t]he agency official shall consider all written requests of individuals and organizations to participate as consulting parties and, in consultation with the SHPO . . . determine which should be consulting parties." 36 C.F.R. § 800.3(f)(3).

19

and the SHPO.[26]  36 C.F.R. § 800.4(d)(1).  The agency's obligations are satisfied if neither the SHPO nor the ACHP, if it has entered the process, objects to the finding within thirty days after receiving the documentation.  36 C.F.R. § 800.4(d)(1)(i).  If, however, the SHPO or a consulting party notifies the agency of its disagreement with the finding, the agency must either consult with the disagreeing party to resolve the matter or request the ACHP to review the finding. 36 C.F.R. § 800.5(c)(2)(i).  The ACHP would then provide an opinion as to the finding within fifteen days after receiving the documentation.[27]  36 C.F.R. § 800.5(c)(3)(i).

Petitioner claims that the FAA failed to abide by the procedural requirements of the NHPA by failing properly to involve consulting parties in the NHPA process.  In particular, Petitioner contends that the FAA did not properly inform the consulting parties of the subject matter of the second special interest meeting and prematurely cut off the consultation process.  Petitioner, furthermore, contends that the FAA failed to provide it with documentation of the finding of no

_____

[26]The NHPA regulations specifically provide for the situation in which an agency must undertake both the NEPA and the NHPA process.  The agency is required to include historic preservation issues in the EA and FONSI/ROD and to otherwise satisfy the requirements of the NHPA.  36 C.F.R. § 800.8.

[27]The agency's obligations would be satisfied if the ACHP failed to respond within the 15-day time period.  36 C.F.R. § 800.5(c)(3)(i).

adverse effect.

To support its claim that the FAA impermissibly "short-circuited" the NHPA consultation requirements, Petitioner offers that the invitation to the second special interest meeting stated the meeting's purpose as the discussion of revised aviation forecasts and noise contours, rather than the discussion of "historic preservation issues." The NHPA regulations simply required the FAA to identify consulting parties and invite them to participate in the NHPA process. 36 C.F.R. § 800.3(f). The regulations do not speak to the form and content of written invitations to meetings with consulting parties. Given that the revised aviation forecasts and noise contour studies were conducted for the purpose of NHPA compliance, it should have been obvious to Petitioner that discussions at the meeting would include historic preservation issues.

Petitioner also reminds us that it requested an additional special interest meeting, a request which the FAA ignored. Prior to this request, the FAA had held two special interest meetings and a public meeting. The FAA had revised aviation forecasts and conducted noise contour analysis in response to concerns raised by the SHPO and the consulting parties. The FAA properly exercised its discretion in concluding that no further meetings would be useful.

Petitioner next claims that the FAA violated the NHPA by failing to provide

21

it with documentation of its finding of no adverse effect. Petitioner seems to operate under the erroneous view that the FAA was required to provide it with all significant written correspondences between the FAA and the SHPO or the ACHP. The FAA was only required to notify consulting parties of its finding of no adverse effect. 36 C.F.R. § 800.4(d)(1). The regulations required the EA and FONSI/ROD to contain this finding. 36 C.F.R. § 800.8(a)(3). The record shows that Petitioner received copies of the Final EA and FONSI/ROD on July 21, 2004. The FAA fulfilled its duty to provide Petitioner with notification of the finding of no adverse effect.

Petitioner finally attacks the FAA's finding of no adverse effect by arguing that the FAA used flawed methodology in assessing noise impacts. The FAA based its noise analysis on revised aviation forecasts prepared during the NHPA consultation process at the behest of the SHPO and the consulting parties. Standard methodology was used to conclude that aircraft operations would not impact any historic properties.[28]

The methodology used to make technical determinations, such as noise impact, is a matter of agency expertise. This court's role is simply to ensure that

---

[28]FAA regulations establish "uniform methodology" for assessing airport noise impact. 14 C.F.R. pt. 150, App. A § A150.1.

the agency utilized legally adequate procedures in applying its expertise. We therefore owe particular deference to the FAA's choice of methodologies with which to analyze noise impacts. See C.A.R.E. Now, Inc., 844 F.2d at 1573.

FAA regulations provide a methodology for developing noise contour maps and determining whether aircraft noise will adversely affect surrounding properties. These regulations mandate the use of day-night average sound level ("DNL") to determine noise impacts.[29] 14 C.F.R. pt. 150.3(b), App. A § A150.3(b). Noise levels below 65 DNL are considered acceptable for all land uses, although "[l]ocal needs or values may dictate further delineation based on local requirements or determinations." 14 C.F.R. pt. 150, App. A § A150.101(d).

Petitioner objects to the FAA's use of the 65 DNL standard for this project, arguing that a higher standard should apply when historic properties are involved. Petitioner rests this argument on dicta from a D. C. Circuit opinion stating that the 65 DNL threshold might be inappropriate for "a village preserved specifically in order to convey the atmosphere of rural life in an earlier (and presumably quieter) century." City of Grapevine v. Dep't of Transp., 17 F.3d 1502, 1508 (D.C. Cir.

---

[29]FAA regulations define DNL as "the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time." 14 C.F.R. § 150.7.

1994).[30] Even if we were to find this dicta persuasive, Petitioner offers no evidence that Oxford is preserved specifically in order to portray some historical time period. FAA regulations establish acceptable noise levels while providing for agency discretion to deviate from these standards if circumstances require. 14 C.F.R. pt. 150, App. A § A150.101(d). In this instance, the FAA determined that circumstances did not so require, and we refuse to second-guess that determination. See C.A.R.E. Now, Inc, 844 F.2d at 1573 (finding FAA's use of 65 DNL threshold to be "legally adequate").

In addition, Petitioner argues that the FAA did not give due consideration to noise deriving from overflights, that is, noise from planes, arriving in and departing from the airport, which fly over Oxford. The FAA took into account all operational activity forecasted at the airport, including flight paths, in determining that Oxford would not suffer from adverse noise impacts.[31] Once again, this court

---

[30]In upholding the FAA's application of the 65 DNL standard to historic properties, the D.C. Circuit goes on to note:

> There is no reason, however, to believe that the use standard applicable to a private home is inapposite merely because the home is historic. Therefore, we uphold in all respects the noise measurement methodology that the FAA used in this case.

City of Grapevine, 17 F.3d at 1508. The FAA is not required to deviate from the DNL standard it normally uses to assess noise impacts merely because a home or, in this case, a town is deemed historic.

[31]The FAA found that the extension of the runway would actually improve noise conditions in surrounding areas.

24

has no discretion to second-guess the FAA's determination.

## III.

NEPA and the NHPA impose procedural requirements on federal agencies, and it is this court's role only to ensure that these procedures are followed. In this instance, the FAA followed the correct procedures. The FAA, therefore, did not act in an arbitrary and capricious manner in approving Covington's proposed project. Petition for review is **DENIED**.

**SO ORDERED.**