**NATIONAL PARKS CONSERVATION ASSOCIATION, INC., a not-for-profit corporation; and Tropical Audubon Society, a Florida not-for-profit corporation, Plaintiffs**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Lt. Gen. Carl A. Strock, Commander and Chief of Engineers in his official capacity; and Atlantic Civil, Inc., Defendants**

No. 06–20256–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Aug. 15, 2006.

Mark A. Brown, Lily N. Chinn, Barry A. Weiner, and Karen D. Wherry, Counsel for the United States.

## ORDER

JORDAN, District Judge.

The National Parks Conservation Association, Inc. and the Tropical Audubon Society (collectively, the "plaintiffs") filed a two-count complaint against the United States Army Corps of Engineers and Lieutenant General Carl A. Strock, the Commander and Chief of the Engineers, in his official capacity (collectively, the "Corps") seeking declaratory and injunctive relief. Count I of the complaint alleges that the Corps' reinstatement and 120–day extension of agricultural fill Permit No. 1995–06797 violated the Clean Water Act ("CWA") and the Administrative Procedure Act ("APA"). Count II alleges that these same actions violated the National Environmental Policy Act ("NEPA") and the APA.[1] The parties filed cross-motions

---

1. The permit holder, Atlantic Civil, Inc. ("ACI"), not originally a party to this suit, filed a motion to intervene as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure, arguing that as the owner of the land and holder of the permit at issue—which allows ACI to fill a portion of federally protected land for agricultural use—it maintained sufficient interest in the suit. That motion was granted in an earlier order. [D.E. 52].

for summary judgement, and presented oral argument. For the reasons explained below, the plaintiffs' motion for summary judgment [D.E. 38] is DENIED, and the motions for summary judgment filed by the Corps and ACI [D.E. 47 and 48] are GRANTED.

## I. FACTUAL BACKGROUND

### A. Request for Five–Year Extension of Permit No. 1995–06797

The relevant and undisputed facts in this matter are as follows. In 1996, ACI submitted an application to the Corps for a Department of the Army ("DOA") permit (also referred to as a 404 permit or fill permit in this matter) to fill certain wetlands of the United States situated on its property, pursuant to § 404 of the Clean Water Act, *found at* 33 U.S.C. § 1344. The CWA, 33 U.S.C. §§ 1251–1387, is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," by, among other things, prohibiting the discharge of pollutants including dredged spoil, into waters of the United States, except in compliance with various sections of the CWA, including § 404. In relevant part, § 404 authorizes the Secretary of the Army, via the Corps, "to issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill". It further provides that the Secretary of the Army, shall, in reviewing each permit application, apply guidelines, codified at 33 C.F.R. Part 203, to govern the Corps' permit review process. The 1996 application was, accordingly, reviewed pursuant to the Corps' § 404 guidelines, NEPA, and the Endangered Species Act ("ESA").

■■■ NEPA, 42 U.S.C. § 4321 *et seq.*, is a procedural statute which creates "a particular bureaucratic decision making process ... not a substantive environmen-

tal statute which dictates a particular outcome if certain consequences exist." *Sierra Club v. United States Army Corps of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002). It requires "[a]gencies to consider the environmental consequences of their actions," before any decision is made with respect to those actions. As a threshold matter, NEPA requires an agency "to determine whether an action is a 'major' action with a 'significant effect.'" *Sierra Club*, 295 F.3d at 1215. This determination requires the agency to prepare an environmental assessment ("EA"). *Id.* at 1215; 40 C.F.R. § 1501.3. The EA "should provide enough evidence and analysis" to yield one of two results:

(1) a finding that the project will have a significant effect, or (2) a finding of no significant impact ("FONSI"). If the latter conclusion is reached, the agency issues a FONSI, which incorporates the EA and explains why the action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13.

If the conclusion in the EA is that the action will have a significant effect, then the project is "major," and the agency must prepare an environmental impact statement ("EIS"), as described in 42 U.S.C. § 4332(2)(c). The EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. It is to "be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." *Id.* The discussion should include any potential impact on endangered or threatened species.

*Sierra Club*, 295 F.3d at 1214–15.

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, was enacted to conserve endangered or threatened plant and animal species. To that end, § 7(a)(2) of the ESA requires every federal agency to insure that any action authorized, fund-

ed, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical ...." *See* 16 U.S.C. § 1536(a)(2). To do this, the ESA requires the action agency, here the Corps, to consult with the United States Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS") whenever a federal action "may affect" an endangered or threatened species. *See* 50 C.F.R. § 402.14(h)(3). Accordingly, § 7 and its implementing regulations set out detailed procedures for "formal" and "informal" consultation designed to provide agencies with expert advice to determine the biological impacts of their proposed activities. *See* 16 U.S.C. § 1536(b); 50 C.F.R. Part 402. "Formal consultation," detailed at 50 C.F.R. § 402.14, concludes with the issuance of a "biological opinion" by the FWS or NMFS, advising the action agency whether any of the listed species are likely to be jeopardized, and if so, whether "reasonable and prudent alternatives" exist to avoid a jeopardy situation. *Id.* at § 402.14(h)(3).

An action agency may use an "informal procedure" to assist it in determining whether and when further consultation is necessary. Informal consultation "includes all discussions, correspondence, etc. between the Corps and the Federal agency or the designated non-Federal representative prior to formal consultation, if required." *Id.* § 402.02. If the agency deter-

mines, with written concurrence by the FWS or NMFS, that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated and no further action is necessary." *Id.* § 402.13(a).

Here, on April 26, 2001, after preparing an EA, a Public Interest Review, and a Statement of Findings, and consulting with the FWS (which concurred with the Corps' determination that the proposed project was not likely to affect any known federal listed species), the Corps issued ACI a 404 permit, Permit No. 1995–06797, which authorized ACI to place 3,606,000 cubic yards of fill over 981 acres, 535.7 acres of which are waters of the United States, and to excavate (rock-mine) 25,800,000 cubic yards of material from 250 acres, 142.4 acres of which are waters of the United States.[2] The site is approximately bounded by Card Sound Road, S.W. 344th Street, S.W. 392nd Street, and S.W. 147th Avenue (the "permit site"). The purpose of the fill and excavation activities was to "improve farmland that has provided only marginal value because of its elevation." The construction period of the permit was originally five years, and was to expire on April 26, 2006.

On March 14, 2005, ACI sent the Corps a letter requesting a five-year extension of Permit No. 1995–06797, citing delay (unrelated to this litigation) in the work authorized by the permit. By May 4, 2005, the Corps, concerned about what ACI planned to do with the permit site *in the next five years*, and pursuant to 33 C.R. § 325.6,[3]

---

**2.** Subsequent to the issuance of the permit, the excavation of 142 acres of waters of the United States and associated mitigation was bifurcated from this permit. *See* Administrative Record ("AR") 836.

**3.** The authorization or construction period of a permit automatically expires "if the permittee fails to request and receive an extension of

time." 33 C.F.R. § 325.6(d). As ACI did here, "the permittee must request the extension and explain the basis of the request." *Id.* The request will be granted, "*unless* the district engineer determines that an extension would be contrary to the public interest." *Id.* If the district engineer determines that "there have been significant changes in the attendant

determined that the request would be treated "anew as a major modification because the attendant circumstances [surrounding the original issuance of the permit] have changed. Namely, it appears that the original purpose was for 'agricultural improvements' and that [the permit site] is now scheduled to be residential." AR 734 (internal Corps e-mail). Accordingly, the Corps determined that it would apply the same procedures required by 33 C.F.R. § 325.2 for new permit applications to ACI's extension request. Specifically, the Corps determined it was necessary to issue a public notice and consider all comments received in response to the public notice in subsequent actions it would take on the permit application. *See* 33 C.F.R. § 325.2(a)(3). Thereafter, the Corps would prepare a Statement of Facts, or, where an EIS has been prepared, the Corps would issue a record of decision ("ROD"). To date, the Corps has not rendered a decision on ACI's request for a five-year extension of its current permit,

and is still in the midst of a full review of the application, including formal consultation with the FWS. *See* AR 738 (letter from Corps to FWS requesting formal consultation on effect five-year extension would have on the wood stork colonies, the Florida Panther, and other endangered species within the permit site). Importantly, the Corps' concerns with respect to the five-year extension request related solely to ACI's *future* use of the permit site.

## B. Suspension of Permit No. 1995–06797

On August 10, 2005, in an internal memorandum, the Corps determined that the circumstances concerning the original issuance of the permit had changed, and that immediate suspension of the permit would be appropriate pursuant to 33 C.F.R. § 325.7(c).[4] According to the memorandum the Corps discovered that on July 18, 2005, ACI submitted a Development Re-

---

circumstances since the authorization was [originally] issued", then the request for the extension "will be processed in accordance with the regular procedures of § 325.2 of this Part, including issuance of a public notice." *Id.* This process is not required where the district engineer determines that no such changes have occurred. *Id.*

4. This provision, governing suspension of permits, reads in pertinent part:

The district engineer may suspend a permit after preparing a written determination and finding that immediate suspension would be in the public interest. The district engineer will notify the permittee in writing ... that the permit has been suspended with the reasons therefor, and order the permittee to stop those activities previously authorized by the suspended permit. The permittee will also be advised that following this suspension a decision will be made to *either reinstate, modify, or revoke the permit,* and that he may within 10 days of receipt of notice of the suspension, request a meeting with the district engineer and/or a public hearing to present information in this mat-

ter. If a hearing is requested, the procedures prescribed in 33 C.F.R. Part 327 will be followed. After the completion of the meeting or hearing (or within a reasonable period of time after issuance of the notice to the permittee that the permit has been suspended if no hearing or meeting is requested), the district engineer will take action to *reinstate, modify, or revoke the permit.*

33 C.F.R. § 325.1(c) (emphasis added). Accordingly, the regulation authorizes the Corps to, in an abundance of caution, suspend a permit in order to determine if reinstatement, modification, or revocation of the permit is the most appropriate action. Most importantly, however, § 325.7(c) specifically contemplates the possibility that the Corps may suspend a permit and then reinstate that permit without the need for the public hearing procedures set out in Part 327 (requiring, among other things, public notice, public hearing, and consideration of public's submissions and recommendations in the Corps' ultimate decision) where, as here, the permittee requests a meeting with the district engineer.

gional Impact ("DRI") application to South Florida Regional Planning Council in which ACI sought permission from Miami–Dade County to construct 6,000 residences (homes/town homes/condos) and develop commercial space on the permit site. *See* AR 830–35 (internal Corps memorandum). Specifically, the Corps determined (1) that the new residential/commercial uses deviated from the agricultural use previously permitted; (2) that the permit site lies within the Florida Panther consultation area—for which the Corps made a "may affect" determination regarding the Panther, and initiated § 7 consultation with FWS under the EPA; and (3) that ACI's residential/commercial project might affect the Corps' prospective Comprehensive Everglades Restoration Plan ("CERP") projects—namely, the C–111 Spreader project alternatives and the Biscayne Bay Coastal Wetlands ("BBCW"). The CERP project alternatives all "incorporated significant portions of the [permit site]." *See id.* at 831–32 (internal Corps emails). Moreover, Monroe County residents were concerned that the ACI project would negatively impact the evacuation time of Monroe County residents. Put simply, the Corps' main concern in August of 2005 was that ACI's *current* activities had deviated from the parameters of the permit as it was issued in 2001.

The Corps memorialized its informal email discussions in an internal memorandum dated August 10, 2005. In that memorandum the Corps explained that "overwhelming information exists to conclude the project may now be contrary to the public interest; that a more detailed examination of the current permit allowing for agricultural fill was warranted; and that public notice and comment was required."

By August 18, 2005, the Corps issued a Notice of Permit Suspension ("NOPS") to ACI, notifying it that Permit No. 1995–06797 was immediately suspended in light of the July 18, 2005, DRI that ACI submitted to the South Florida Regional Planning Council indicating ACI's intent to shift from agricultural to residential and commercial use of the permit site; that ACI's change in land use constituted a substantial change of circumstances warranting a reevaluation of the permit under 33 C.F.R. § 325.7(c); and that given the substantial change it was in the public interest to immediately suspend the permit. *See* AR 904.

### C. Partial Reinstatement of Permit No. 1995–06797

On August 29, 2005, pursuant to § 325.7(c), ACI requested a meeting with the Corps to discuss the suspension. *See* AR 907–08. In that request, ACI argued that the suspension was premature because the prospective changes in land use referred to in the NOPS had not yet been reviewed or approved by any agency; the existing land use on the permit site remained agricultural with some mining—in compliance with the permit; and the Application for Development Approval for a proposed DRI was in the preliminary sufficiency review stage of the application process, such that no changes to the land use had taken place or would take place in the foreseeable future.

On September 1, 2005, in an internal e-mail, members of the Corps' team assigned to review the suspension indicated that four BBCW project alternatives impacted the ACI properties and might conflict with ACI's *current* permitted activity. *See* AR 912–13.[5] After meeting with ACI on Au-

---

**5.** The permit site is approximately bounded by Card Sound Road, S.W. 344th Street, S.W. 392nd Street, and S.W. 147th Avenue. So,

each BBCW alternative project essentially ran through ACI's property site. The four alternatives and their impact were as follows. The

gust 29 and September 1, 2005, the Corps, on September 8, 2005, issued a permit reinstatement letter to ACI informing it that the work previously authorized by Permit No. 1995–06797 could resume. *See* AR 917. In an additional letter to ACI, sent that same day, the Corps warned that it was aware of ACI's pending DRI; that any change in circumstances or any proposed change in land use would require modification of the permit and prompt the Corps to undertake full review of the potential impacts of this change on the watershed and the public interest; and that the Corps was concerned ACI's prospective residential/commercial project could affect at least two of the Corps' BBCW project alternatives. *See id.* 919–20. Put simply, the Corps reinstated the permit on the grounds that the DRI application was in a preliminary phase, and that ACI had not acted beyond the scope of the original permit, nor would it act beyond scope of the permit in the foreseeable future, but warned that if ACI did act outside the permit, the Corps would respond with a public review process.

The Corps, having determined that the DRI no longer posed a problem and therefore that no substantial change in circumstances had occurred, nevertheless expressed concerns that ACI's current permitted activity on the permit site conflicted with the Corps' CERP projects. On the day the permit was reinstated, ACI sent the Corps a letter acknowledging receipt of the reinstatement letter and indicating that, pursuant to the Corps' request, it agreed to stop all permitted activities—filling and/or de-mucking—south of S.W. 360th Street until November 15, 2005, *see* AR 918, such that the Corps could have more time to determine which CERP project alternatives it would select and a better understanding of any potential conflicts between the CERP projects and ACI's permitted agricultural activities on the permit site. *See id.* 971–73 (internal Corps memorandum, dated November 23, 2006, documenting procedural history of the reinstatement decision).

### D. 120–Day Extension of Permit No. 1995–06797

On November 17, 2005, ACI sent a letter to the Corps indicating that based on its November 14, 2005, meeting with the Corps, it was requesting an immediate 120–day extension of its permit so that the permit would expire on August 21, 2006, and not in April of 2006, in order to make up for the delays and losses resulting from the August 2005 suspension decision, hurricanes, ineffectiveness of limiting filling activity to areas north of S.W. 360th Street, and demobilizing and remobilizing manpower and machinery on-site. *See* AR 968. ACI further indicated that it would continue to voluntarily restrict the filling operations to areas north of S.W. 360th Street if the Corps granted the extension. *Id.* at 969. On November 23, 2005, the Corps had granted ACI's 120–day extension request, but also notified ACI that its five-year extension request was still under review; that the Corps would continue to monitor the DRI application; that if ACI proceeded with construction of infrastructure on fill, such activity would constitute a substantial change in use and require full review; and that full review would still be

Yellow Book alternative had a spreader canal through the northern portion of the ACI property and a large "STA" to the west. Alternatives J, E, and M were all intended to rehydrate all lands to the south of the positioned spreaders and/or S.W. 360th Street. In alter-native J, the spreader was positioned south of S.W. 344th Street (midway towards 360th Street), while alternatives E and M used culverts along S.W. 360th Street (stopping somewhere between S.W. 147th Avenue and 152nd Avenue).

required even after the area was entirely filled. *See* AR 969–70.

In an internal memorandum, dated November 23, 2005, the Corps made a "no effect determination" on the Florida Panther as to the 120–day extension because the extension upheld the original authorization for agricultural filling—that is, ACI had not deviated from the scope of permitted activity—noted that the extension compensated the permittee for delays caused by the Corps during the suspension of the permit. *See* AR 971. The Corps also noted that it was aware, based on the DRI, of ACI's *potential* interest in constructing residential and commercial space in an area that it is currently filling for agriculture, and that if ACI made a decision to proceed with construction of any infrastructure it would need a permit modification from the Corps, which would require a "full and careful public interest review, including public notice." *Id.* at 972. Additionally, the Corps indicated that it was still engaging in internal efforts to determine whether the current permitted agricultural filling would conflict with the BBCW and C–111 Spreader projects, and that it would have a better understanding of any potential conflicts by December 15, 2005. Accordingly, the Corps determined that a 120–day extension, coupled with ACI's continued cooperation in refraining from any activity in areas south of S.W. 360th Street, was appropriate.

### E. Full Reinstatement of Permit No. 1995–06797

On December 12, 2005, in a series of internal e-mails discussing ACI's continued voluntary restriction on its fill permit, Corps employees determined the following regarding five BBCW project alternatives. *See generally* AR 981–83. As to the Yellow Book alternative (which, according to the Corps, was least likely to be selected as the Tentative Selected Plan or TSP), it

was the only project with a physical feature on the ACI property. Alternative E "comes close" to interfering with ACI's property. Alternative J attempts to raise stages on an existing canal within the property. Alternatives E and J would likely increase water levels on the site. Alternative Q, crafted specifically to avoid a high priced "RE", proposed a protective berm/seepage canal system around ACI's proposed fill pad. Alternative M2, like Q, would generate significant bird habitat, and appeared best overall for wetlands restoration. The Corps, however, concluded that it was too early to tell what impact the fill would have on the BBCW alternatives, that the analysis was incomplete, and that it would not have a TSP until mid-February of 2006. These findings were then documented in an internal memorandum dated December 19, 2005. *See id.* at 984–87. The Corps also determined that the selected C–111 Spreader Canal project alternative would not conflict with the permit site. *See id.* at 1049. Accordingly, the Corps concluded that it would be inequitable to restrict ACI to working only north of S.W. 360th Street under Permit No. 1995–06797.

On December 20, 2005, in a letter to ACI, the Corps determined that it was "unable to conclude that there exists a direct conflict between the filling [ACI] is authorized to conduct and the CERP project in the areas, since the permitted fill would only allow use of the areas for agricultural purposes." AR 988–89. The letter further indicated that ACI could resume "activities as allowed" under Permit No. 19950–6797, which would expire on August 21, 2006. *Id.* The Corps also informed ACI that it would continue to monitor ACI's interest in constructing homes on the permit site, as well as the status of the pending DRI, and that any change in circumstances would constitute a modifica-

tion and require full review as required by the 404 guidelines, even if the site was completely filled. *Id.*

## II. PROCEDURAL HISTORY

On January 31, 2006, the plaintiffs filed a two-count complaint against the Corps alleging that its reinstatement and extension actions violated NEPA, the CWA, and the APA for failing to follow the requisite procedures—that is, among other things, to provide adequate notice and comment regarding its reinstatement of ACI's fill permit, to hold a public hearing, explain the grounds for its reinstatement and extension decisions, to disclose or discuss the effects of reinstatement and extension, to explain how the reinstatement and extension are consistent with the public interest, and to analyze the intended change in use of the property at the time the reinstatement and extension decisions were made. The plaintiffs also argued that such conduct was arbitrary and capricious. The plaintiffs seek declaratory and injunctive relief (namely, revocation of Permit No. 1995–06797, cessation of any further filling under authority of the permit, and removal of all fill placed under authority of that permit until a valid NEPA analysis is completed).

On March 2, 2006, the plaintiffs moved for a preliminary injunction. Thereafter the parties, after filing their respective motions for summary judgment, agreed to stay consideration of the preliminary injunction motion and instead proceed to resolve the matter via expedited consideration of their cross-motions for summary judgment. On June 16, 2006, a hearing was held on all pending motions for summary judgment.

## III. LEGAL STANDARD

■ A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The inquiry, therefore, is whether "the evidence presents a sufficient disagreement to require [trial] or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this assessment, I must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555, 1558 (11th Cir.1990). "However, even in the context of summary judgment, an agency action is entitled to great deference." *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs,* 87 F.3d 1242, 1246 (11th Cir.1996).

## IV. DISCUSSION

### A. Jurisdiction

In its cross-motion for summary judgment, ACI contends that I lack jurisdiction to review the Corps' decision to reinstate and then extend Permit No. 1995–06797 because they do not constitute final agency

action, and are therefore, not subject to judicial review under § 704 of the APA. I find ACI's argument unpersuasive in light of well-established Supreme Court and Eleventh Circuit precedent.

 In pertinent part, the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. "Federal jurisdiction is ... [therefore] lacking when the administration action in question is not 'final' within the meaning of 5 U.S.C. § 704." *National Parks Conserv. Assoc. v. Norton,* 324 F.3d 1229, 1236 (11th Cir.2003). The Supreme Court defines "final agency action" as follows:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Chicago & Southern Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948) and *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)). *See also Darby v. Cisneros,* 509 U.S. 137, 144, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury ...."); *Franklin v. Mas-*

*sachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) ("The core question [in the finality determination] is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). "By contrast, the Supreme Court has defined a non-final agency order as one that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.' " *Norton,* 324 F.3d at 1237.

Here, there is little question that the reinstatement and extension decisions were neither "tentative" nor "interlocutory."

 As to the reinstatement decision, after the Corps suspended ACI's permit, it proceeded, under 33 C.F.R. § 325.7(c), to determine whether it would ultimately reinstate it, modify it, or revoke it. *Id.* at § 325.7(c) (after suspension and the completion of a meeting or hearing "the district engineer *will take action* to reinstate, modify, or revoke the permit") (emphasis added). Pursuant to the plain language of § 325.7, the suspension itself is a preliminary and/or precautionary measure the Corps takes in order to give itself time to determine whether it should ultimately revoke, modify, or reinstate the permit. Thus, the final action under § 325.7 is the revocation, modification, or reinstatement. ACI's contention—that the Corps' decision to reinstate the permit constituted a decision not to revoke, which constituted a decision to maintain the status quo pre-suspension is, at best, semantic gymnastics, and, quite simply, inaccurate.

If there is any preliminary, interlocutory, and/or temporary action here it is the Corps' initial act of suspension. The reinstatement decision, in contrast, is not only the consummation or completion of the Corps' suspension decision, it is also the

action by which the rights of ACI under Permit No. 1995–06797 were determined. That is, during the suspension, ACI was in a holding pattern, unable to conduct any activity on the permit site. Once the Corps reinstated the permit, ACI regained the "right" to continue agricultural fill activities on the permit site.

ACI relies on the Eight Circuit's decision in *Missouri Coalition for the Environment v. Corps of Engineers,* 866 F.2d 1025, 1032 n. 10 (8th Cir.1989) for the proposition that the reinstatement decision, or, as ACI refers to it, the Corps' decision not to revoke under § 404, is committed to the Corps' discretion, constitutes inaction, and is therefore not reviewable under the APA. This reliance, however is misplaced.

In *Missouri Coalition,* the Corps re-evaluated an existing § 404 permit to determine if the permit-holder's change in activity on the permit site constituted a significant increase in the scope of permitted activity, or if potential impacts of the revised project were substantially similar to those evaluated prior to issuance of the original permit, such that revocation, suspension, and/or modification was not appropriate. The Corps determined that there was neither an increase in scope nor a substantial change in circumstances and left the permit unchanged. In holding that "the decision not to modify, suspend or revoke a[§ ] 404 permit is" not reviewable under the APA, the Eight Circuit relied on the Supreme Court's decision in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In that case, the Supreme Court explained the difference between agency action, which is reviewable under the APA, and agency inaction, which is not reviewable. *Heckler* held that where the FDA was petitioned to review the unapproved use of a drug which had been previously approved by the FDA, and refused to take the requested action, that decision was not judicially reviewable. *Heckler* explained that "an agency's refusal to institute proceedings" constitutes inaction, and is left to Congress, not to the courts, to review. *Id.* at 837–38, 105 S.Ct. 1649.

This case is not one involving agency inaction. The Corps did not decline to enforce NEPA, the CWA, or the ESA. To the contrary, this case centers around the Corps' very enforcement of those statutes, that is, whether the Corps properly applied NEPA, the CWA, and the ESA to its reinstatement and 120–day extension decisions. These decisions were, by definition, final agency actions, and are therefore reviewable under the APA. Simply put, there is little question that the Corps' reinstatement decision constituted final agency action under § 704 of the APA, and, therefore, that there is federal jurisdiction to review that action here. *See Bennett,* 520 U.S. at 177, 117 S.Ct. 1154; *Heckler,* 470 U.S. at 837, 105 S.Ct. 1649.

■ A similar rationale applies to the Corps' extension decision. ACI requested a 120–day extension to compensate for the delays and losses it incurred from, among other things, the suspension of the permit. Pursuant to 33 C.F.R. § 325.6(d), the Corps granted ACI the extension request after it determined that there was no substantial change in circumstances, such that Permit No. 1995–06797 is now set to expire on August 21, 2006. ACI's characterization of the Corps' action as a "decision to temporarily extend" the permit may be factually accurate, but is legally irrelevant. The Corps, once it extended the permit for 120–days, had made the ultimate decision required by § 325.6(d) as far as the extension request was concerned. Furthermore, once the Corps decided to grant ACI's 120–day extension request, ACI's rights under the permit were determined—that

is, ACI was permitted to continue its fill activity under Permit No. 195–06797 until August 21, 2006, rather than having to stop filling in April of 2006.

To the extent ACI argues that the 120–day extension is temporary because of the Corp's upcoming decision on the request to extend the permit for another five years, it mistakenly conflates the 120–day request and the five-year request. ACI requested the 120–day extension after it had submitted its five-year extension request, solely because it sought to be compensated for the delays associated with the suspension of the permit, and not to account for the decision-making delays associated with the five-year extension request.[6] The two extension requests are unrelated. Accordingly, I am convinced that the 120–day extension decision constituted reviewable final agency action.[7]

### B. Standard of review

 Challenges to agency actions brought under NEPA, the ESA, and the CWA are reviewed under the arbitrary and capricious standard, as defined by the Administrative Procedure Act, 5 U.S.C. §§ 701–706. "Under this standard, the reviewing court gives deference to the agency decision by reviewing for clear error, and by refraining from substituting its own judgment for that of the agency." *Sierra Club*, 295 F.3d at 1216 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The court must, however, "look beyond the scope of the decision itself to the relevant factors that the agency considered." *Id.* (internal citations omitted). The court is duty-bound to "ensure that the agency took a hard look at the environmental consequences of the proposed action." *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir.1990). This duty requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record. *See Sierra Club*, 295 F.3d at 1216.

 The Corps will have met its "hard look" obligation if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its actions including rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856. An agency's decision will be overturned as arbitrary and capricious under "hard look" review if that decision "suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency

**6.** Accordingly, the Middle District's decision in *Turtle v. County Council of Volusia County*, which held that amendments to an interim extension of an ESA permit pending an application for renewal were not final agency action because they constituted intermediate steps associated with final agency action, and on which ACI relies, though only persuasive authority, is nevertheless inapposite. 2005 WL 1227305 *10 (M.D.Fla. May 3, 2005). Here, the 120–day extension was strictly associated with suspension delays (as well as delays unrelated to the Corps, like those caused by weather), and was not an extension request associated with any delays or loss of time relating to the Corps' ongoing decision-making process regarding the permit.

**7.** Although not a basis for my decision that federal jurisdiction exists here, it is worth noting that the Corps itself neither raised this jurisdictional question nor joined in ACI's jurisdictional challenge in its pleadings or in the June 2006 hearing, and has at no time in these proceedings suggested that this court lacks jurisdiction to review its reinstatement and 120–day extension decisions.

expertise." *Sierra Club*, 295 F.3d at 1216 (internal citations omitted). If the reviewing court finds "deficiencies in the agency's rationale," the matter *must* be remanded to the agency "so that it may reconsider its own reasoning and decision." *Id.* The reviewing court may not take it upon itself to rectify those deficiencies or provide a reasoned basis for the decision which the agency itself did not articulate. *Id.*

 Put simply, under the APA, "a court shall set aside an action of an administrative agency where it is arbitrary, capricious, or an abuse of discretion. The court shall not substitute its judgment for that of the agency." *Cobb's History*, 87 F.3d at 1246 (internal citations omitted).

## C. Analysis

### 1. Reinstatement of Permit No. 1995–06797

On August 18, 2005, upon learning that ACI had submitted a Development of Regional Impact application for residential and commercial development on the permit site (governed by DA Permit No. 1995–06797 issued to ACI in 2001), the Corps issued ACI a notice of suspension pursuant to its authority under 33 C.F.R. § 325.7(c). In the notice the Corps explained that the proposed development project as described in the DRI application constituted a "proposed change of use" and represented "a substantial change of circumstances warranting a reevaluation." AR 905. On August 29, 2005, ACI requested a meeting with the Corps, as permitted under § 325.7(c), contending that the DRI application was in the initial stages of the review process, and, therefore, that the suspension was "premature." *Id.* at 907–08. ACI further noted that at no time had its activities on the permit site deviated from those authorized by the permit—that is, its activities remained agricultural with some mining, as authorized

by its permit. *Id.* at 908. Additionally, a letter from the South Florida Regional Planning Council, dated August 17, 2005, informed ACI that its DRI application was insufficient. *Id.* at 847. The Council attached 29 multi-part questions which ACI had to answer before its application would be considered. *Id.* at 847, 851–846. If ACI failed to respond timely, the Council would consider the application withdrawn. *Id.* at 847. The letter also attached comments and requests for additional information from seven other agencies to which ACI was required to respond. *See id.* at 855. It was apparent form the Councils letter that approval of the DRI application, let alone any construction on the permit site, was far from occurring any time soon.

By the time it met with ACI on August 30 and September 1, 2005, to discuss the suspension, the Corps knew that ACI's proposed projects were in the early stages of planning. On September 8, 2005, the Corps reinstated ACI's permit in a brief Notice of Permit Reinstatement without a stated reason for the reinstatement. Contemporaneous documents in the administrative record, however, reveal that during its meeting with ACI and pursuant to its independent review of the DRI applications' status, the Corps determined that (1) the residential/commercial project planned for in the DRI was far from being realized, and that (2) any construction or development on the permit site was highly unlikely, if not impossible, from taking place prior to the expiration of ACI's permit (which at the time of the reinstatement decision was scheduled to elapse in April of 2006). The Corps, determined that ACI would not engage in any non-permit activity during the remaining life of Permit No. 1995–06797, and, therefore, that there was no substantial change in circumstances, no need for suspension, revocation, or modification of the permit, and therefore, no

need for a public review of the permit. *See* AR 919–20

In addition to the DRI application, the Corps was also concerned about how the current permitted agricultural use of the permit site might impact proposed CERP projects—namely, the C–111 Spreader Canal and the BBCW projects. As to that concern, the parties agreed that ACI would limit its agricultural activities to areas on the site south of S.W. 360th Street in order to give the Corps the opportunity to investigate whether the existing permit would need to be modified so as to avoid any conflicts with the CERP projects.

■■■■■ The administrative record reveals that there was no change in circumstances surrounding Permit No. 1995–06797, let alone a substantial change in circumstances, as the Corps had originally anticipated when it first suspended the permit. That is, despite ACI's DRI application and anticipated plans for a residential/commercial development project on the permit site, ACI had not changed any of its activities on the permit site. According to the administrative record, at no time did ACI engage in conduct prohibited by the agricultural fill permit—ACI remained faithful to the scope of the permit. The Corps acted well within its authority under the CWA when it suspended the permit *sua sponte* pursuant to § 325.7(c), believing that there was a substantial change in circumstances—that is, that ACI was engaging in commercial use of the land—and conducted an informal meeting with ACI. The Corps, however, also acted within its authority when it reinstated the permit without a public NEPA or § 404 hearing. Under § 325.7 it is clear that if the permittee requests a meeting, rather than a hearing, the Corps need not issue a public notice or hold a public hearing. The Corps did not abuse its discretion in deciding to reinstate the permit based upon a

finding that ACI had not acted outside the scope of the permit, that any un-permitted conduct was at best speculative given that the Council had taken no action on ACI's DRI application, and that approval of the DRI (let alone planned construction on the permit site) was not likely to occur prior to expiration of the permit. Furthermore, the Corps, in its reinstatement letter and contemporaneous correspondence to ACI, warned that although the proposed residential/commercial project was speculative, and that any change of use on the subject property would require a modification of the permit, which would require full review even if the land was completely filled.

On this administrative record I am satisfied that the Corps' reinstatement decision was not implausible or irrational. The record reveals that the DRI application was nowhere near approval, that ACI had not engaged on activities contrary to its DA permit, and that pursuant to an agreement, ACI would restrict its activity to an area that would not conflict with potential CERP projects until the Corps could fully investigate the impact ACI's current activity might have on those projects (and whether a modification to the existing permit was in order). *See Sierra Club,* 295 F.3d at 1216. The administrative record further reveals that the Corps' reinstatement decision was not contrary to the evidence before it—there is substantial evidence in the record indicating the DRI application was still under review; moreover, the record does not contain any evidence that ACI was acting outside the scope of the permit such that there was a "substantial change in circumstances." *Id.* To the contrary, the record reveals that there was no change in the circumstances involving Permit No. 1995–06797. Finally, contrary to the plaintiffs' contention, the administrative record makes clear that the Corps did provide a contemporaneous ra-

tional explanation for its reinstatement decision—namely that circumstances had not changed, and that ACI agreed to refrain from activity south of S.W. 360th Street. Thus, the Corps did not act arbitrarily and capriciously in reinstating the permit.[8]

Finally, the record does not reveal that the Corps failed to consider an important aspect of the project, or that its decision did not comport with Congressional intent. Again, to the contrary, the Corps, once it determined that ACI's proposed development project was still in the planning and approval phase and that ACI was still limiting its activities on the permit site to permitted behavior, switched its attention, again *sua sponte*, to ACI's permitted conduct (agricultural filling and excavation) to determine its impact on the pending CERP projects. In so doing, it reached an agreement by which ACI would not conduct *any* activity on the portion of land that the CERP projects might impact specifically so the Corps would have more time to determine whether any conflict would exist. Pursuant to the agreement to limit ACI's activity, ACI would be able to resume activities south of S.W. 360th Street on November 15, 2005. At that time, the Corps had not selected a project alternative for the C–111 Spreader Canal or the BBCW, and asked ACI to continue restricting its activity until December 15, 2005, so that the Corps could further investigate the matter. In late December, the Corps determined that the C–111 Spreader Canal project would not impact the permit site and that a BBCW alternative project would not be selected until February of 2006, and that it would be inequitable to continue restricting ACI from full use of the permit site. I conclude on this record that the Corps took measures to assure that it had fully considered the impact ACI's permitted behavior might have on the CERP projects. Accordingly, the Corps' decision to reinstate Permit No. 1995–06797 was neither arbitrary nor capricious, and that the Corps' actions complied with both the APA, and the CWA.

To the extent the plaintiffs argue that the Corps' decision is entitled to less deference because the reinstatement constituted a change in policy, I disagree. The plaintiffs' reliance on *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and its progeny is misplaced. In *Cardoza–Fonseca*, the Supreme Court addressed the issue of whether an agency's statutory interpretation in cases where Congress has not deliberately left a gap in the legislation for the agency to fill—that is, where Congress has not expressly delegated authority to the agency to elucidate statutory provision via regulations—is entitled to less deference when it results in a change in the agency's prior interpretation or policy. That is not the situation here. The plaintiffs have adduced no evidence suggesting that the Corps has reversed a prior policy or statutory interpretation, or that it did anything more than determine that suspension was unnecessary, all pursuant to its authority under NEPA, the CWA, the ESA, and their respective regulations. Moreover, the plaintiffs have pre-

---

**8.** The plaintiffs rely heavily on the fact that the notice of permit reinstatement did not provide a reason for the Corps' reinstatement decision. But I am not restricted to reviewing only the notice of reinstatement. I am instead required, when reviewing an agency decision, to review the entire record. *See Sierra Club,* 295 F.3d at 1216. Here, the record contains ample contemporaneous evidence of the Corps' basis and rationale for reinstating the permit, including internal Corps emails and memos, and correspondence between the Corps and ACI. Contrary to the plaintiffs' assertions in its motion and at the June 16, 2006, hearing, the Corps did not act on a whim or take inexplicable, inconsistent, or irrational actions as to the reinstatement decision.

sented no case law suggesting that the Corps is not authorized to reinstate a suspended permit without a public hearing once it has determined that no substantial change in circumstances has occurred. In light of the plain language of § 325.7—which permits the Corps to suspend a permit until such time as it determines whether to reinstate, revoke or modify that permit and itself contemplates that the Corps may, after suspending a permit, reinstate it—I doubt any such case law exists.

 The plaintiffs' contention that the Corps' reinstatement decision violated NEPA is equally unconvincing. The plaintiffs argue that the Corps failed to, among other things issue public notice regarding the reinstatement, hold a public hearing, take action on its own "may affect" determination regarding the Florida Panther, or formally consult with FWS or consider its preliminary findings. The record, however, reveals that because there was not a substantial change in circumstances, there was no modification of the permit, and that because the Corps was not issuing a new permit, NEPA procedural requirements were not triggered in this case. Accordingly, the Corps did not have to take any

of the NEPA-required actions of reviewing the permit anew under the CWA, see 33 U.S.C. § 1344(a); 33 C.F.R. 352.2. I also fail to see, as the plaintiffs contend, how the suspension and reinstatement decisions constituted a "major" agency action with a "significant effect," such that the Corps would have to produce an environmental assessment, or comport with any other NEPA procedures. See 40 C.F.R. § 1501.3. The anticipated changes in ACI's development plan are merely speculative, at best, and do not constitute a substantial change in circumstances to trigger a public review process. And while the plaintiffs are concerned about the impact that ACI's future residential/commercial development project will have on the permitted area, those concerns, though they may be well-founded, are of no moment in this litigation, nor is the Corps' actions regarding the request for a five-year extension of the permit. Any impact the future development project might have on the permit site is, I imagine, the subject of the Corps' review of ACI's request for a five-year extension of its current permit, which the Corps has not completed (at least as of the date of the June 16, 2006, hearing), which is not at issue in this case, and over which I do not have jurisdiction.[9] Accordingly,

9. I am similarly unmoved by the plaintiffs' reliance on the Corps communications with the FWS as evidence that the Corps did not formally consult with the FWS, disregarded the FWS' recommendations, and/or ignored the "cumulative effects" of the ACI's proposed residential/commercial project on the permit site in violation of NEPA, the CWA or the ESA. First, the Corps was not required to consider any cumulative effects where none existed—that is, during the life of Permit No. 1995–06797 there were no plans for development or actual construction on the permit cite. Accordingly, since the proposed project was not set to begin until after Permit No. 1995–06797 expired, there appears no reason for the Corps to have considered it in its reinstatement or extension decisions (as it had already considered the cumulative effects

of that permit when it was first approved in 2001) even though this may be relevant in the Corps' review of the five-year extension request. This is particularly true where, as here, the circumstances were such that there was no substantial change in activity, nor a modification to the permit. Second, according to the record, any comments from the FWS regarding the impact on the Panther and other endangered species related to the Corps' inquiry into the five-year extension request. See AR 749–50 (Corps's letter to FWS requesting review of five-year permit extension), 763 and 826 (email between Corps and FWS regarding five-year extension), 939–44 (FWS report on impact of five-year permit extension on Florida Panther, wood Stork and other endangered species). There is nothing in the administrative record to sug-

the Corps was not statutorily obligated to provide public notice, hold a public hearing, or provide the public an opportunity to comment pursuant to § 404 of the CWA and/or NEPA when it decided to reinstate ACI's permit. Thus, summary judgment in favor of the Corps and ACI as to the Corps' reinstatement decision is appropriate.

### 2. 120–Day Extension of Permit No. 1995–06797

On November 15, 2005, ACI requested a 120–day extension of Permit No. 1995–06797 in order to make up for the delays and losses resulting from the August 2005 suspension decision, hurricanes, ineffectiveness of limiting filling activity to areas north of S.W. 360th Street, and demobilizing and remobilizing manpower and machinery on-site. ACI agreed to continue refraining from any permitted activities south of S.W. 360th Street. The Corps granted the extension since ACI did not request, plan, or anticipate engaging in any activities outside the scope of the original permit. Accordingly, as with the reinstatement decision, the Corps, not faced with any change in circumstances, was not required to apply full NEPA review to the 120–day extension request. Under 33 C.F.R. § 325.6(d) "the permittee must request the extension and explain the basis of the request." The request will be granted, *"unless* the district engineer determines that an extension would be contrary to the public interest." If the district engineer determines that "there have been significant changes in the attendant circumstances since the authorization was

gest that the FWS made any findings, let alone negative findings, as to the impact of ACI's permitted activity (agricultural fill and excavation) on the Florida Panther or other endangered species during the suspension and reinstatement process, as the plaintiffs suggest.

[originally] issued", then the request fore the extension. "will be processed in accordance with the regular procedures of § 325.2, . . . including issuance of a public notice." This process is not required where the district engineer determines that no such changes have occurred. Accordingly, I am similarly satisfied that the Corps did not act arbitrarily or capriciously when it decided to grant ACI the 120–day extension.

### 3. Plaintiffs' Endangered Species Act Claim

In their motion for summary judgment the plaintiffs, for the first time, argue that the Corps's reinstatement and 120–day extension decisions violated the Endangered Species Act. The plaintiffs, however, failed to explicitly allege a violation of the ESA their complaint, and according to the Corps, have waived that claim, such that I do not have jurisdiction to review it on summary judgment. I disagree.

"It is well settled that where a complaint fails to cite the statute conferring jurisdiction the omission will not defeat jurisdiction if the facts alleged in the complaint satisfy the jurisdictional requirements of the statute." *Hildebrand v. Honeywell, Inc.,* 622 F.2d 179, 181 (5th Cir.1980) (internal citations omitted).[10] "Moreover, the district court has a duty under Rule 8(a) of the Federal Rules of Civil Procedure to read the complaint liberally and determine whether the facts set forth justify it in assuming jurisdiction on grounds other than those pleaded." *Id.*

**10.** The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit render4ed prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

*See also Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development,* 711 F.2d 989, 995 (11th Cir. 1983) (for purposes of notice pleading "the complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'")(citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Here, the complaint is rife with references to the ESA and its accompanying regulations, and includes several statements suggestion the Corps' actions violated the ESA. *See* Complaint at 2 (alleging that the Corps made a "may affect" determination regarding the permitted activity and the Florida Panther habitat, and that the Corps initiated consultations with the FWS pursuant to the ESA); *id.* at 10 (allegations that the Corps "must consult with the FWS" pursuant to the ESA); *id.* at 11–15 (detailed discussion about the EPA and its accompanying regulations, and the Corps' duties under the ESA). *See also id.* at 18 and 34–35. Additionally, during a status conference before Judge Gold, before the case was transferred to me, the plaintiffs notified the Corps that it intended to file an amended complaint to include an ESA claim. The plaintiffs failed to ever do so, and did not specifically argue an ESA violation until summary judgment. However, it is quite clear from both the complaint and the status conference that the plaintiffs from the start of the lawsuit intended to raise an ESA claim, and basically did so in the complaint. Put differently, I am convinced that the Corps was given sufficient notice of the plaintiffs' intention of making allegations of ESA violations from the complaint and more explicitly from the status conference. Accordingly, I am satisfied that the plaintiffs have not waived the ESA violation.

Nevertheless, for reasons already explained regarding the plaintiffs' NEPA, CWA, ESA, and APA claims, I am not convinced that a genuine issue of material fact exists as to whether the Corps acted arbitrarily or capriciously under the ESA. Accordingly, summary judgment in favor of the Corps and ACI is also appropriate as to the ESA claims.

■■■ Specifically, § 7(a)(2) of the ESA requires every federal agency to insure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical [. .]." 16 U.S.C. § 1536(a)(2). To do this, the ESA requires the Corps to consult with FWS and/or the National Marine Fisheries Service ("NMFS") whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(h)(3); 50 C.F.R. Part 402 (§ 7 implementing regulations setting out detailed procedures for "formal" and "informal consultation designed to provide agencies with expert advice to determine the biological impacts of their proposed activities").

As noted earlier, the Corps did make a "may effect" finding. It also consulted with the FWS regarding the may effect finding. However, the "may effect" finding, and the consultation with FWS, as noted earlier, related to the Corps' review of the five-year extension request, and was unrelated to the reinstatement and 120-day extension. Moreover, the subsequent "no effect" determination by the Corps was made with respect to the reinstatement decision after the Corps determined that the DRI application and ACI's prospective development project had no impact on the existing permit since no action

would take place prior to the permit's expiration. Accordingly, I am satisfied that the Corps was not required to institute FWS consultation for the reinstatement decision or the 120–day extension decision, and that based on this administrative record, the Corps did not act arbitrarily or capriciously under the ESA. Summary judgment in favor of the defendants is, therefore, appropriate as to the ESA claim as well.

## IV. CONCLUSION

The administrative record reveals that at no time during the suspension, reinstatement, or 120–day extension decisions did ACI act outside the scope of the original permit. Similarly, the record does not suggest that either the reinstatement or the 120–extension in any way constituted modifications to the permit, as the plaintiffs suggest. Likewise, the record is devoid of any evidence suggesting that the DRI application had any impact on ACI's activities on the permit site prior to either the April 2006 or August 2006 expiration date. I, therefore, conclude that no issue of fact exists as to whether a substantial change in circumstances occurred, or whether the reinstatement and 120–day extension decisions triggered NEPA and its procedural requirements, or § 404 review. In other words, because (1) their was no change in the circumstances surrounding the initial approval of the original permit, (2) ACI had not attempted to broaden the scope of the permit, and (3) the Corps, via its agreement to ACI to restrict its filling activities, took measures to determine whether the agricultural permit conflicted with the CERP projects and would therefore require modification of the permit, no substantial change in circumstances occurred, the public review process was not triggered, and the Corps did not act arbitrary and capaciously by not conducting such a review process.

ACI's DRI application, and its prospective development project, though the basis of the plaintiffs' lawsuit, may certainly affect circumstances surrounding the five-year extension request. However, they did not and still do not impact Permit No. 1995–06797, the only subject of this lawsuit. To the extent the plaintiffs rely on the DRI application as evidence of a substantial change in circumstances requiring a modification of the permit or consideration of the permit anew, they do so prematurely. The DRI application and ACI's future development projects do not affect Permit No. 1995–06797 because they have done nothing to change ACI's conduct on the permit site. ACI continues its fill activity on the permit site and has limited such activity to the scope of its § 404 agricultural fill permit. Accordingly, the plaintiffs have adduced no evidence to suggest that the Corps was faced with a substantial change in circumstances requiring public notice and hearing, that the Corps' action boiled down to a permit modification, or that the Corps was required to engaged in a full permit review process pursuant to NEPA, CWA, and the ESA.

Put simply, there is no issue of fact suggesting that the Corps acted arbitrarily and capriciously. The Corps examined the relevant data, and articulated a satisfactory and rational explanation for its decisions to reinstate and extend the permit for 120 days, and thus took a "hard look" at the consequences of its actions. *See Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856.

Accordingly, the plaintiffs' motion for summary judgment is denied. The Corps' and ACI's motions for summary judgment are, granted. Final judgment in this matter will be entered by separate order.

## FINAL JUDGMENT

On August 15, 2006, summary judgment was granted in favor of the United States

Army Corps of Engineers, Lt. General Carl A. Stock, Commander in Chief of Engineers, in his official capacity (collectively, the "Corps"), and Atlantic Civil, Inc. ("ACI").

Pursuant to Federal Rules of Civil Procedure 54 and 58, final judgment is entered in favor of the Corps and ACI, and against the National Parks Conservation, Inc. and Topical Audubon Society (collectively the "plaintiffs"). The plaintiffs shall take nothing by this cause. Costs will be taxed upon appropriate motion.

This case is CLOSED and any pending motions are DENIED AS MOOT.